**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

No. 01-50698

---

UNITED STATES OF AMERICA

Plaintiff-Appellant,

v.

ELROY HERNANDEZ-BAUTISTA, PRUDENCIO GARCIA-RODRIGUEZ, AMADO OCHOA-BERNAL, JESUS GUTIERREZ-GUZMAN, JOSE GUTIERREZ-GUZMAN, and JESUS ORNELA-YANEZ

Defendants-Appellees.

---

Appeal from the United States District Court
For the Western District of Texas, Pecos Division

---

June 11, 2002

Before DUHÉ, BARKSDALE, and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:

The United States appeals from a final judgment of the district court granting the defendants' motions for judgment of acquittal after the jury returned guilty verdicts against Elroy Hernandez-Bautista, Prudencio Garcia-Rodriguez, Amado Ochoa-Bernal, Jesus Gutierrez-Guzman, Jose

1

Gutierrez-Guzman, and Jesus Ornela-Yanez .[1]  Because we conclude that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt,"[2] we affirm.

FACTS AND PROCEDURAL HISTORY

A grand jury charged, by superseding indictment, that "Eloy [*sic*] Hernandez-Bautista, Prudencio Garcia-Rodriguez, Amado Ochoa-Bernal, Jesus Gutierrez-Guzman, Jose Gutierrez-Guzman, and Jesus Ornelas-Yanez [*sic*],[3] and others, aiding and abetting one another, knowingly did possess with intent to distribute 100 kilograms or more, but less than 1000 kilograms, of marijuana" in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.[4]  The defendants entered pleas of not guilty.

Three United States Border Patrol agents assigned to the Van Horn, Texas border patrol station, Chris Rick, William Crow, and Estavan Zamora, testified at trial.  Their patrol area included Chispa Road, a 17-mile dirt road between the U.S.-Mexico border and Farm to Market Road (FM) 2017.  According to the agents, six electronic sensors on Chispa Road can inform border patrol agents of vehicular traffic near the border and the relative speed at which a vehicle is traveling.[5]  In

---

[1]Although Hernandez-Bautista's counsel participated fully in the trial, he did not file a brief in this appeal or appear at oral argument.

[2]*Jackson v. Virginia,* 443 U.S. 307, 319 (1979).

[3]The discrepancy between the spelling of some defendants' names in the indictment and on appeal is unexplained.

[4]The grand jury also charged the defendants with involving a person under eighteen years of age, Amado Ochoa-Bernal's younger brother, in their criminal enterprise in violation of 21 U.S.C. § 861(a).  At trial, however, the judge refused to admit evidence of the brother's age and dismissed the count at the conclusion of the government's case.

[5]The agents testified circumspectly about the operation and location of these sensors because revealing their exact locations might lead to destruction of the sensors or avoidance of the sensors by illegal traffic.

2

addition, personnel sensors, at undisclosed locations in the Chispa Road area, can indicate pedestrian traffic crossing the border. The agents acknowledged, however, that these sensors do not record all vehicular and pedestrian traffic in the Chispa area. The sensors cannot detect the size or weight of a vehicle.

The agents testified that during the afternoon and evening of March 1, 2001, approximately ten sensors, both personnel and vehicle, indicated traffic in the Chispa Road sector. There is no indication in the record that agents responded to these sensor alerts. Shortly after 10:30 p.m. that night, the Chispa Road sensors indicated a vehicle traveling north from the border at great speed. Agent Rick, who had been with the Van Horn border patrol for two and one-half years, drove to the intersection of FM 2017 and Chispa Road to await the arrival of the speeding vehicle. He testified that the night was very dark, overcast, and rainy.

After waiting for almost an hour without seeing any sign of the vehicle that had set off the sensors, Agent Rick called for assistance and continued to wait. Just as two more agents arrived on the scene, Rick, using night vision goggles, saw a pickup truck traveling rapidly towards him. The truck turned onto FM 2017, then turned left onto Highway 90 heading towards Van Horn. Rick testified that he followed the truck, which immediately "chopped its speed and began swerving." Rick initiated a traffic stop assisted by Agents Crow and Zamora. Rick told the driver, Hernandez-Bautista, that he was conducting a U.S. immigration inspection and asked where he was born. Hernandez-Bautista showed the agents his immigration documents and a driver's license issued to him in Chicago, Illinois. Agent Rick testified that Hernandez-Bautista, who appeared very nervous, said that he was coming from Mexico. Rick asked for permission to search the vehicle, which Hernandez-Bautista granted. The agents found nothing illegal. They did find a couple of two-way

3

radios. Agent Crow, who speaks Spanish fluently, testified that Hernandez-Bautista told him "that he had gone down to the river with some buddies and had left them down there fishing; he was on his way back to Van Horn to pick up a tire or to get a tire fixed from an abandoned vehicle that was down on Chispa Road, down the river road with a flat tire. He attempted to fix it, wasn't able to fix it, and was on his way to Van Horn at that time."[6] The truck that Hernandez-Bautista was driving had Texas license plates and appeared to have been recently spray painted white. There was no luggage or spare tire in the truck.

Believing the situation to be suspicious, Agent Rick asked Hernandez-Bautista to accompany him to the Van Horn border patrol station for a more thorough search by dogs trained to detect contraband. Hernandez-Bautista agreed and followed Rick to the station. Again, nothing illegal was found in the truck. Around midnight, Agent Rick released Hernandez-Bautista, then followed him to a nearby motel where he checked in for the night.

Agents Crow and Zamora proceeded to Chispa Road and found a truck with a flat tire as described by Hernandez-Bautista. Using his flashlight, Crow, an agent with 22 years experience, noticed a footprint, or track, with a running "W" pattern in the middle of Chispa Road adjacent to the abandoned truck. He then found a group of tracks heading northeast from the road. He followed these tracks, which included the running "W," a "fine line horizontal gripper or boot,"and a "broken bar work boot" for about 100 yards, then returned to his vehicle, leaving Agent Zamora to continue following the tracks. Agent Crow testified that he was using a technique called "leapfrogging" to

---

[6]Agent Zamora, who assisted Agents Rick and Crow on the stop, testified, consistent with a report that he had written nearly two months after the incident, that he talked extensively with Hernandez-Bautista during the stop and was told a somewhat different story. The district court later struck all of Zamora's testimony about his conversation with Hernandez-Bautista because Hernandez-Bautista's counsel was not provided with a copy of Zamora's report before trial.

speed up the trailing process by looking for tracks ahead of the ones already found.

Zamora, a new agent with less than seven months experience in the field, followed the tracks for another 500 yards in an easterly direction. At that point Zamora received a call on his radio informing him that Crow had found more tracks on the Listening Post/Observation Post (LP/OP) Road east of Zamora's location. Agent Zamora stopped tracking the prints leading away from Chispa Road and climbed up a 300 foot incline to the LP/OP, which is located on a ridge overlooking the area. If the footprints that Agent Zamora had been tracking were the same as those discovered by Agent Crow, the persons who made those footprints would have had to ascend this ridge. Zamora had difficulty climbing the ridge because of the darkness, loose rocks, and vegetation. At the LP/OP, Agent Zamora relieved Agent Smith, who had been manning the post,[7] and began to operate the LORIS scope, which registers heat sources such as human beings and animals and illuminates them on a screen. With LORIS, however, it is very difficult to judge distance between the operator and objects on the screen. Furthermore, the heat source must be in the direct line of sight of the system for an image to register. Zamora used the LORIS to look northeast from the LP/OP for signs of people in the area where Chispa Road meets FM 2017, but detected nothing except animals and his fellow agents. Zamora then moved with the LORIS to the intersection of FM 2017 and Highway 90, approximately three miles from Chispa Road. Again, the LORIS failed to detect any significant heat sources indicating pedestrian traffic.

While Zamora was searching with the LORIS scope, Crow followed the tracks he had located on the LP/OP road for about 250 feet until he came to an arroyo. In the arroyo he and Agent Smith discovered five duffel bags containing a total of 121 kilograms of marijuana. Crow estimated that

---

[7]Because Agent Smith did not testify, there is no record of his observations that night.

5

the marijuana was about a mile and a half from the abandoned pickup truck.[8] There were tracks all around the marijuana, and Crow found tracks leading away from the arroyo in a southerly direction. Crow followed these tracks for approximately 100 yards, but did not attempt to follow them further in the darkness and down the steep ridge. Instead, he called Zamora on the radio and told him to relocate to the LP/OP Road with the LORIS scope. Once in position on the LP/OP Road, Zamora looked south with the scope and panned back and forth across the landscape. Eventually, he detected six individuals heading away from his location. Zamora informed the other agents and watched the six figures for approximately 30 to 45 minutes. He was able to detect them intermittently until they finally went out of sight somewhere east of Needle Peak. Meanwhile Agents Smith, Rick, and Crow carried the marijuana to Crow's vehicle.

Smith and Rick then drove down Chispa Road to a point south of the Needle Peak area. They walked toward the general area where Zamora had last detected the six figures on the LORIS scope and found Ornela-Yanez, the Ochoa-Bernal brothers, Garcia-Rodriguez, and the Gutierrez-Guzman brothers sitting together on the ground. The men had with them a backpack containing cans of food and water. Rick estimated that about an hour and a half had passed between loading the duffel bags and discovering the six men. Crow said that he looked at the soles of the men's shoes. Crow testified, "[T]he tracks left by the shoes of the Defendants were similar to those tracks that I saw on the ground." He estimated that the men were nearly three miles from the arroyo where the agents found the marijuana. The agents then took the men to the Van Horn border patrol station.

---

[8]The jury could infer that there was a one-half mile gap between the point that Zamora stopped tracking and the point where Crow picked up tracks on the LP/OP road based on the agents' estimation of the distances they tracked and the distance between the marijuana and the abandoned pickup truck.

Once at the station, the agents interviewed the six men and asked them to lift up their shirts. According to the agents, some of the men, including Jose and Jesus Gutierrez-Guzman, had red marks on their backs as if they had been carrying heavy objects. The agents took pictures of the defendants, the duffel bags, and the plastic-wrapped packages of marijuana. They also photographed the soles of five pairs of footwear. The agents asked each man if he knew Hernandez-Bautista, and they all denied knowing or having met him before. They also denied any knowledge of the existence of marijuana or duffel bags. They uniformly told the agents that they were illegal aliens coming to the United States to work.

The agents testified that they later destroyed the drugs and the duffel bags without notice to the defendants' counsel and did not preserve the evidence for trial. The defendants' provision bag, which had been brought to the border patrol station, disappeared and no inventory of its contents was made. The three agents testified that none of them made any contemporaneous notes or reports of the night's events. Although another agent wrote a report, he did not testify and the report was not introduced at trial.

Six weeks after the defendants' arrests, agents returned to the Chispa Road area and took photographs in preparation for trial. One agent took photographs of the ground that allegedly showed the tracks that Agents Crow and Zamora had tracked six weeks earlier. The agent who took the photographs did not testify.

In contrast to the government's theory of a drug-smuggling attempt by the defendants, three of the alleged marijuana backpackers testified that they were illegal aliens attempting to find work in the United States. Jose Gutierrez-Guzman and his wife testified that they have three children and live

7

in Garcia de la Cadena, in the State of Zacatecas, one of the poorest places in Mexico. Jose's wife told the jury that the men in Garcia de la Cadena regularly form small groups to travel together to the United States to find work. Jose and his wife testified that the men from Zacatecas usually crossed the border with the help of a coyote, a person who smuggles illegal immigrants into the United States for a fee.[9] Jose testified that in 1998 he successfully crossed the border with a group of 14 men from his village, including his brother and Prudencio Garcia-Rodriguez. The men, aided by a coyote, crossed into Arizona by walking through the desert. They traveled to Alexandria, Virginia by car where Jose, his brother, and Garcia-Rodriguez found construction work. Both Jose and Jesus Gutierrez-Guzman sent money and letters home to Zacatecas.[10] Jose testified that in Virginia they could earn almost three times the amount of money in one day than they could in a week at home.

Jose Gutierrez-Guzman, his wife, and Garcia-Rodriguez's wife testified that in late February 2001, Jose, his brother Jesus, and Prudencio Garcia-Rodriguez decided to leave their families again to seek employment in the United States.[11] Jose's wife said that he and Jesus hoped to return to Virginia to work in construction again. Garcia-Rodriguez's wife told the jury that Prudencio intended to look for work in Chicago where his brother and sister-in-law live. The three men traveled by bus for 20 to 22 hours to reach Ciudad Juarez, located across the border from El Paso, Texas.

Jose Gutierrez-Guzman testified that upon their arrival in Juarez, the men went to a hotel located near the bridge between the United States and Mexico where the coyotes usually wait for

---

[9]*See* Merriam-Webster's Collegiate Dictionary 269 (10th ed. 1998).

[10]Envelopes from the letters were entered into evidence.

[11]All three of the men are married and have young children.

customers. Near the bridge, the men from Zacatecas found a coyote who promised to obtain fake identification cards and take them across the border for a fee. According to Jose Gutierrez-Guzman, the coyote told them to give him their clothes because the extra clothing would raise questions at the border. After they paid the coyote and he left, presumably to obtain the necessary paperwork, the men had some doubts and tried to find him again. Although the coyote had said he lived in the area, no one seemed to know anything about him.

While they were searching for the coyote, the Zacatecas men met Amado Ochoa-Bernal and Jesus Ornela-Yanez, who were also looking for coyotes to take them across the border.[12] Ornela-Yanez's wife told the jury that she has permanent resident status in the United States, which allows her to cross the border freely. Ornela-Yanez and his wife testified that they have two boys and live in Ciudad Juarez with her parents. They testified that her mother had been very ill with heart problems, and they needed money to pay her medical bills. Because Ornela-Yanez had previously worked with his uncle at a dairy in Morton, Texas, he intended to return there to work. According to Ornela-Yanez and his wife, the plan was for Ornela-Yanez to cross the border and then call his wife to tell her where he was so that she could drive across the border and pick him up.

Ornela-Yanez testified that the group from Zacatecas told him and Ochoa-Bernal about the coyote taking their money and clothes and not returning. After discussing the matter with Ochoa-Bernal and the Zacatecas men, Ornela-Yanez suggested that they all try to cross together as a group without a coyote. Ornela-Yanez testified that he invited everyone to his father's house where he proposed that they cross the border near his family's ranch, down the river from Juarez. Everyone

---

[12]According to the defendants' testimony, the men from Zacatecas had never met Ochoa-Bernal or Ornela-Yanez before.

9

agreed to the plan and they went to a store in Juarez and purchased provisions for their trip including a backpack, bottled water, cans of sardines, beans, and salmon, crackers, and drinks to prevent dehydration. Ornela-Yanez said the bag weighed about 10 kilograms. They picked up Ochoa-Bernal's younger brother, Soccoro, who also wanted to go to the United States.

Ornela-Yanez told the jury that his father drove them to the area where Ornela-Yanez's father had successfully crossed the border in the past as a worker in the Bracero Program.[13] Ornela-Yanez's father instructed them to cross the Rio Grande quickly and then follow Chispa Road north until they reached U.S. Highway 90. According to the defendants, they crossed the border and began walking along beside the Chispa Road, taking turns carrying the provisions bag. Ornela-Yanez said that they were careful not to walk on the road itself because they did not want U.S. Border Patrol agents to see their footprints. The day was overcast and cloudy, with sporadic rain. Whenever they heard vehicles on the road, which happened several times, they moved into arroyos to avoid being seen. At some point during their journey, they crossed over Chispa Road. They continued walking after dark. When they eventually saw vehicle lights ahead of them in the dark, the men at first thought they were seeing the headlights of cars on Highway 90. But when they saw that the vehicle had lights on top, like border patrol cars, they quickly fled south. After putting a locally prominent feature, Needle Peak, between themselves and the lights, they sat down to rest. They had come at least 13 miles from the border. About 30 minutes later, Border Patrol agents discovered the men southeast of Needle Peak and took them to the town of Van Horn.

Jose Gutierrez-Guzman testified that before their arrest he had never met Hernandez-Bautista.

---

[13]The Bracero Program allowed Mexican laborers into the United States for temporary agricultural work from 1951-1964. *AFL-CIO v. Dole*, 884 F.2d 597, 601 (D.C. Cir. 1989).

10

He told the agents that he knew nothing about the bags with marijuana. He said the agents had asked him to remove his shirt at the border patrol office, but that there were no red marks on his body. He testified that could not identify any of the shoes in the government's photograph as the ones he was wearing the night he was arrested.[14]

Jesus Gutierrez-Guzman testified that he had never possessed marijuana and could not identify any of the footwear in the photograph as his. He acknowledged that the agents had requested that he take off his shirt at the station, but said that he had not seen any red marks on his body. He was not asked during the trial if he knew Hernandez-Bautista.

Ornela-Yanez denied crossing the border with marijuana and denied seeing any marijuana on the journey. He said he has never possessed marijuana. On cross-examination Ornela-Yanez pointed to one of the five shoes in the government's photograph that he thought was his shoe. He was not asked if he knew Hernandez-Bautista. Neither Garcia-Rodriguez nor Ochoa-Bernal testified.

The government's theory at trial was that Hernandez-Bautista had driven across the border from Mexico with the six men and the five duffel bags of marijuana in his truck. The government hypothesized that Hernandez-Bautista stopped at the abandoned pickup truck to let the men out. According to this theory, the six men then hiked to the arroyo with the marijuana and left it there. The men were on their way back to Mexico when they were detected by the border patrol agents.

The parties stipulated that (1) the substance in the duffel bags had been tested by an expert and was determined to be marijuana; (2) the amount of marijuana seized was 121.14 kilograms; (3)

---

[14]Speaking through an interpreter, Jose Guiterrez initially stated, "I don't know which one it is," because "I don't ever see the bottom of them." He later testified that he wore a brown boot that looked like one of the shoes in the photograph, but was the color of another one.

11

there were no fingerprints on the marijuana packages; and (4) the agents did not examine or test the duffel bags for hair or fibers. Agent Crow testified that the photograph of the soles of the defendants' footwear showed a running "W," a "fine line horizontal gripper or boot,"and a "broken bar work boot," similar to the tracks he had followed near the abandoned pickup truck. No one marked which boot came from which defendant, however, and the actual footwear was not introduced at trial. Furthermore, from the photographs of record, we cannot determine that the marks identified by Crow match the soles of the defendants' footwear. The court denied a defense request for a jury view of the area where the events occurred.

On June 22, 2001, the jury returned a guilty verdict as to each of the defendants. Immediately after the jury rendered its verdicts, however, the judge granted judgments of acquittal as to all of the defendants pursuant to Federal Rule of Criminal Procedure 29, which provides that a court shall order the entry of judgment of acquittal if the evidence is insufficient to sustain a conviction. The United States filed a notice of appeal. The district court subsequently conditionally granted defendants' motion for a new trial, should the judgments of acquittal be reversed on appeal. The United States did not appeal from the district court's conditional granting of the motion for a new trial.

ANALYSIS

We give no deference to a district court's decision that the evidence admitted at trial was insufficient to support the jury's guilty verdict.[15] "Instead, we review *de novo* a district court's grant of a judgment of acquittal, applying the same standard as the district court."[16] We must determine,

---

[15]26James Wm. Moore, et al., *Moore's Federal Practice* § 629.05[1] (3d ed. 1997)*; United States v. Baytank, Inc*., 934 F.2d 599, 606 (5th Cir. 1991).

[16]*United States v. Loe,* 262 F.3d 427, 432 (5th Cir. 2001).

12

therefore, whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[17]  In doing so, we consider the evidence in the light most favorable to the government, drawing all reasonable inferences in support of the verdict.[18]  "However, we must reverse a conviction if the evidence construed in favor of the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged."[19]

A conviction for possession of marijuana with intent to distribute requires proof that the defendant (1) knowingly (2) possessed marijuana (3) with intent to distribute it.[20]  To aid and abet, a defendant must associate with the criminal venture, participate in it, and seek by his actions to make the venture succeed.[21]  We must determine whether a rational jury could have found *each* defendant guilty beyond a reasonable doubt.[22]

*Hernandez-Bautista*

While the jury "is free to choose among reasonable constructions of the evidence,"[23] we can find little evidence to support Hernandez-Bautista's conviction.  The government has failed to establish that Hernandez-Bautista became associated with, participated in, or somehow acted to

[17]*Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

[18]*United States v. Ortega Reyna*, 148 F.3d 540, 543 (5th Cir. 1998).

[19]*United States v. Dean*, 59 F.3d 1479, 1484 (5th Cir.1995) (citation and quotations omitted).

[20]*United States v. Cano-Guel*, 167 F.3d 900, 904 (5th Cir. 1999).

[21]*United States v. Stone*, 960 F.2d 426, 433 (5th Cir. 1992).

[22]*United States v. Fuller*, 974 F.2d 1474, 1477 (5th Cir. 1992).

[23]*Baytank*, 934 F.2d at 616.

further the possession and distribution of the marijuana that the agents testified they found on March 1, 2001.[24] While actual physical possession is not necessary to convict for aiding and abetting,[25] a defendant must share in the intent to commit the offense as well as play an active role in its commission.[26]

Viewing the evidence in the light most favorable to the government, we conclude that no rational trier of fact could find Hernandez-Bautista guilty beyond a reasonable doubt. The evidence, considered in a light most favorable to the government, supports a finding of only a *possible* connection between Hernandez-Bautista, the marijuana, and the other defendants. The government's evidence indicates that Hernandez-Bautista was never seen or detected within one and one-half miles of the marijuana stash that the agents said they found. The agents did not find any tangible evidence of connexity between Hernandez-Bautista or his truck and the other defendants. Although the agents found a pair of two-way radios in Hernandez-Bautista's truck, there is no other evidence in the record that tends to prove that the radios were used or intended for use to communicate with the other defendants. The agents found no evidence in the truck that it was used to transport people or marijuana.[27] No marijuana or other evidence of connexity was found in the abandoned truck on Chispa Road. There was no evidence of any familiarity between Hernandez-Bautista and the other defendants. Because the evidence supports a theory of innocence at least as much as a theory of guilt

---

[24] *See United States v. Chavez*, 947 F.2d 742, 745 (5th Cir. 1991).

[25] *Id.*

[26] *U.S. v. Delgado*, 256 F.3d 264, 274 (5th Cir. 2001) *(citing United States v. Lombardi*, 138 F.3d 559, 561 (5th Cir. 1998)).

[27] *Cf. United States v. Carroll*, 591 F.2d 1132 (1979) (traces of marijuana found in bed of lead vehicle contributed to reasonable suspicion to stop load vehicle).

and of the crime charged, we conclude that the district court did not err in granting an acquittal.[28]

*Jose and Jesus Gutierrez-Guzman, Garcia-Rodriguez, Ornela-Yanez, and Ochoa-Bernal*

The government's evidence that each of these defendants aided and abetted possession with intent to distribute marijuana is constitutionally insufficient to convict, considering the evidence of record and the government's burden of proof. We agree with the district court that the government has failed to introduce sufficient evidence to support any rational juror's finding of each of the defendant's guilt beyond a reasonable doubt. The government agents found the six men, not in proximity to the marijuana that the government alleges they possessed, but nearly three miles away from the arroyo where the marijuana was hidden. Furthermore, a steep ridge covered in vegetation lies between the location of the marijuana and Needle Peak where the men were found. According to the government's theory, the defendants climbed up this ridge in the dark carrying heavy packs. Yet there was no evidence introduced at trial that the men had engaged in a strenuous climb through rough terrain. Jose Gutierrez-Guzman, Jesus Gutierrez-Guzman, and Ornela-Yanez all denied having any knowledge of the marijuana. The agents also testified that all of the men denied knowing Hernandez-Bautista or about the presence of marijuana in the desert when questioned at the border patrol station.

The government failed to establish support for a rational finding beyond a reasonable doubt that the tracks found around the marijuana bundles matched the defendants' footwear the night they were arrested. The border patrol agents followed the footprints found near the marijuana bags for only a short distance. The agents did not discover the men by tracking their footprints, but found them after being advised by Agent Zamora that he had detected six individuals on the LORIS scope.

---

[28] *See United States v. Dean*, 59 F.3d 1479, 1484 (5th Cir.1995).

15

The agent most knowledgeable about tracking could only testify that "the tracks left by the shoes of the defendants were similar to those tracks that I saw on the ground." Furthermore, he acknowledged that millions of shoes existed with soles capable of leaving tracks with the same features. From the photographs of record, we cannot determine that the tracks in the desert, identified by Crow as "accurately purport[ing] to show what [he] saw" as he tracked the night of March 1, 2001, match the marks on the soles of the footwear in the government's photograph. The agents did not continuously track the footprints leading from the pickup truck to the marijuana or from the marijuana to the defendants.

The defendants told stories that were consistent with their situations. They testified that they had previously crossed the border illegally to work in the United States and the government offered no cogent evidence to prove that they had different motives at the time of their arrest. In addition, the men were prepared for a long walk through the desert with provisions of food and water. Several vehicle and pedestrian sensors indicated traffic earlier that day before border patrol agents decided to apprehend the speeder on Chispa Road at 10:30 p.m. The agents admitted that people continuously cross the border in the Chispa Road area without being detected by sensors.

The defendants' behavior was consistent with their innocence of the charged offense. The men in the desert did not flee when apprehended by the agents, but submitted to their authority. The alleged red marks on the men's backs, if any, could have been caused by the straps of the provisions bag, which they took turns carrying and which disappeared while in the care and custody of the government.

No one testified to having seen any of these defendants in possession of marijuana or large bags, other than their provisions bag. The jury heard Agent Zamora agree that many undocumented

16

aliens used the Chispa Road area to come into the country, a statement that supports a theory of innocence and the defendants' story. Agent Crow conceded that the duffel bags of marijuana could have been in the arroyo for several days before they were found.

After having reviewed the record in its entirety and the arguments of counsel, we conclude that the evidence is insufficient to support a finding of guilt beyond a reasonable doubt. The government has not sufficiently proven a theory linking Hernandez-Bautista in his pickup truck heading north on Chispa Road, six men on foot in the desert, an abandoned pickup truck with a flat tire facing southbound towards the border, and five bags of marijuana located in an arroyo several miles away from the defendants. Considering all of the relevant factors, no rational trier of fact could find the essential elements of the crimes charged by any of the defendants beyond a reasonable doubt. We reach this conclusion after considering the evidence in the light most favorable to the government and having drawn all reasonable inferences in support of the verdict.

For the foregoing reasons, the judgment of the district court is AFFIRMED.