

## NUMBER 13-06-00646-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

**ELLILIAN JUD RAMOS,**                             **Appellant,**

**v.**

**THE STATE OF TEXAS,**                               **Appellee.**

### On appeal from the 370th District Court
### of Hidalgo County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Yañez and Benavides
Memorandum Opinion by Chief Justice Valdez**

A jury convicted appellant, Ellilian Jud Ramos ("Ellilian"), of the offense of trafficking of persons, a second-degree felony. *See* TEX. PENAL CODE ANN. § 20A.02 (Vernon Supp. 2008). The jury assessed punishment at four years' imprisonment and a $10,000 fine, and recommended suspending the sentence and placing Ellilian on community supervision for four years. In rendering its judgment of conviction and sentence, the trial court accepted the jury's recommendation. In nine issues on appeal, Ellilian contends that: (1) the

evidence is legally and factually insufficient; (2) the court erred by denying Ellilian's motion for instructed verdict; (3) various violations resulted from the trial court's failure to instruct the jury that it must unanimously agree on the specific act or acts Ellilian committed; and (4) the trial court erred by failing to instruct the jury that it must unanimously agree on whether Ellilian acted as principal or party. We affirm.

## I. BACKGROUND

On September 22, 2005, a grand jury indicted Ellilian and her husband, Juan Carlos Ramos ("Juan"), for the offenses of trafficking Floridalma Flores Sales and Maria de Jesus Batres. *See id.* Both Ellilian and Juan pleaded "not guilty" and proceeded together to a trial by jury.

### A. The State's Evidence

*1. Sales's Testimony*

Sales, a Guatemalan citizen, testified that in August 2004, she and Batres crossed illegally from Guatemala into Mexico and then traveled to Matamoros to find work. While in Matamoros, Sales worked as a companion and housekeeper for Juan's mother, Maria Rangel Tristan. Tristan told Sales that she had children living in the United States and that if her children "gave [Sales] the opportunity," Sales should go to the United States to work for them.

Sales testified that in October or November of 2005, she met Juan and Ellilian when they came to visit Tristan. During their visit, "[t]hey told [Sales] that if [she] was to come with them to [the United States], they would pay [her] $125 per week for cleaning, . . . cooking, and caring for the kids." Sales told Juan and Ellilian that she did not have "any documents" to allow her to cross into or work in the United States, and that Batres was also interested in working in the United States. Juan and Ellilian told her that

2

they would pay a "coyote"[1] $250 to cross Sales into the United States, and that once in the United States, Sales "would be able to work it off."[2]  Sales accepted the offer.  Juan told Sales "that soon he would call [her] over the phone to make the arrangements, and that they would cross [Sales and Batres] over."

Sales testified that Juan called her one day, though she was not sure of the day, and told her that "everything was taken care of."  On November 12, 2004, two men picked up Sales and Batres and drove to the bus station in Matamoros.  The men parked the car at the station and walked along the river with Sales and Batres until they reached a place suitable for crossing.  One man swam across with Sales and Batres.  Upon reaching the United States, they traveled by foot to a "pharmacy or a gas station" where the man telephoned Juan.  Juan "quickly" arrived in a "Suburban" with Ellilian's brother, Hector De Alejandro ("Hector").  Sales and Batres got into Juan's vehicle while Juan talked to the man that had helped them cross.  Juan dropped Sales off, with only the clothes that she was wearing, at his home in Mission, Texas, and then he and Hector drove Batres to the home of Ellilian's mother, Dora De Leon ("Dora"), in McAllen, Texas.

Sales testified that as soon as she entered Juan and Ellilian's home, she "started working" by washing dishes and taking clothes out of the dryer.  Additionally, she testified that while she worked for Juan and Ellilian, she worked seven days a week for twenty to twenty-two hours per day.  Sales thought that she would have to work for two weeks to pay Ellilian and Juan back for crossing her; however, Sales testified that after completing her first week's work, Ellilian told Sales that she would have to work at least one year before

---

[1] A "coyote" is "a person who smuggles illegal immigrants into the United States for a fee."  *United States v. Hernandez-Bautista*, 293 F.3d 845, 850 (5th Cir. 2002).

[2] Sales further testified that Juan and Ellilian also offered to pay an additional $250 to cross Batres, and that Batres could work for Ellilian's mother, Dora De Leon ("Dora"), as a caregiver to Dora's mother, Marina De Alejandro ("Marina").

3

she would be paid "because not even in one year would [Sales] pay her off for having [Sales] brought across." Sales told Ellilian that she had come to Texas to provide her children with a "better future." Ellilian responded by telling Sales that she had come to "chingotearte."[3] Sales testified that "[f]rom that week forward," Ellilian told her that if she "didn't do what [she] needed to do at the house and stop asking for her salary," Ellilian would report Sales to the police or "Immigration," and Sales would be sent back to Guatemala. Although Sales testified that Ellilian treated her poorly, she testified that Juan was "very nice to [her] all the time," and that he even brought Sales the clothes that she had left at Tristan's home in Matamoros.

Sales testified that two to three weeks after she began working for Juan and Ellilian, they took her to work at Pappasito's, an adult day care center run by Ellilian's sister, Haydee Estrada. At Pappasito's, Sales saw Batres, who was caring for Marina. One day at Pappasito's, Sales met Maria Valladares, another worker. As Sales and Valladares cleaned out an ice maker, Sales quietly asked Valladares if she would "help [her and Batres] to get out of there" because they were "suffering a lot" and "being denied food." However, the conversation abruptly ended when either Ellilian or Estrada entered the room and asked Sales and Valladares what they were talking about.

One day in early January 2005, Marina, accompanied by Batres, spent the night at Ellilian's home. The next day, Dora confronted Batres and told her that if she did not take proper care of Marina, Batres was "going to go straight to jail" and "from there [to] Immigration." Sales intervened, stating that she "was sick and tired of being threatened." Ellilian told Sales to be quiet; however, Sales retorted, "Yes, but you threaten me just as

---

[3] Sales testified that "chingotearte" means to work hard under slave-like conditions.

4

much . . . ." Ellilian then told Sales that she was going to be sent back to Matamoros. Sales responded that she would "prefer to go to Matamoros and not suffer," and that she wanted Ellilian to pay her the money that she had earned.[4] After the argument, Dora suggested that both Sales and Batres live and work in her home. Sales and Batres left with Dora, but Ellilian refused to allow Sales to take any clothes other than the ones that she was wearing.

Soon after moving to Dora's, Sales gave a note to Jose Munoz, a man Batres had befriended at Pappasito's. Sales testified that Munoz delivered the note to Valladares.[5] Valladares contacted Batres and arranged to help Sales and Batres "escape." At 10:00 p.m. that evening, Sales and Batres snuck out of a bedroom window and met Valladares's daughter, who was waiting for them in a car parked near Dora's home. She took Sales and Batres to Valladares's house. Soon after, Sales and Batres reported their experience to a representative of United Farm Workers. Later, they detailed their encounter with Investigator Ted Rodriguez of the Mission Police Department. During cross-examination, Sales conceded that she was not physically held in Ellilian's house; however, she testified that she was held by Ellilian's threats of calling the police.

*2. Batres's Testimony*

Batres testified that after crossing the river, she and Sales were picked up by Juan and Hector in a gray Suburban. She testified that upon arriving at Juan's home, Hector drove her in a white van to Dora's home. Batres testified that the argument arising from her care of Marina took place around January 1, 2005, and that after the argument Sales

---

[4] Sales testified that up until this point, she had only been paid $200 by Ellilian and had not been compensated by Pappasito's.

[5] The note requested help and provided a telephone number for Valladares to call to communicate with Batres.

came to live with her at Dora's. Batres additionally testified that Sales did not have any clothes with her because Ellilian "took all of it [sic] from her."

*3. Additional Testimony*

Valladares testified that she had worked only one day for Pappasito's, and that while at Pappasito's, Sales asked for her help. Valladares testified that at lunchtime, Ellilian told her to sit and eat. Valladares noticed Sales and Batres "go to one side, and . . . put their hands behind their back[s]." Ellilian told Valladares that Sales and Batres were not going to eat because they were going to eat at home. Valladares insisted that if Sales and Batres could not eat, neither would she. Valladares then gave Sales and Batres her plate to share, finished working that day at Pappasito's, and never again returned to work.

Valladares testified that sometime later, Munoz gave her "a little paper" with a telephone number that she used to contact Batres. Valladares testified that at 10:00 p.m. one night, her daughter retrieved Sales and Batres from outside Dora's home.

Investigator Rodriguez testified that Sales and Batres filed an initial report with the Mission Police on February 8, 2005. On February 23, 2005, Sales and Batres came to the station and gave individual statements to Investigator Rodriguez. On April 18, 2005, Investigator Rodriguez spoke to Ellilian at Pappasito's; Ellilian denied knowing Sales and Batres. However, two days later, Ellilian phoned the police department and alleged that Sales had sexually assaulted Ellilian's youngest son. Ellilian never followed up her complaint by filing a proper statement with the Mission Police Department.

After the State rested its case-in-chief, Ellilian moved for a directed verdict. The trial court denied Ellilian's motion.

**B.    The Defense's Evidence**

6

*1. Ellilian's Testimony*

Ellilian testified that she met Sales on November 23, 2004 at Tristan's home in Matamoros. At this meeting, Sales showed Ellilian a California ID. Ellilian agreed to pay Sales $120 per week to care for her youngest son. A few days later, Juan brought Sales to their home in Mission. Sales arrived with a mesh bag containing personal items and clothes. Ellilian asked Sales if her trip was okay, and then asked Sales to go to sleep.

Ellilian testified that although Sales had visited Pappasito's for a Christmas party, she had never worked there. Ellilian stated that she made biweekly withdrawals to pay Sales, and that on January 4, 2005, Sales left Ellilian's residence to live with Dora. Sales took her clothes when she moved to Dora's, as well as clothing that Ellilian had purchased for her. Ellilian further testified that Investigator Rodriguez had not spoken to her at Pappasito's on April 18, 2005, and that she did not meet him until she was arrested on June 21, 2005.

On cross-examination, Ellilian denied paying to have Sales and Batres crossed into the United States, threatening or withholding money from Sales, or treating Sales poorly. Ellilian also testified that Sales had "molested" her son, and that Ellilian did not report the abuse to police until June 2005 because she did not know Sales's last name.

*2. Estrada's Testimony*

Estrada testified that, as the sole owner of Pappasito's, she was the only person with authority to hire employees. Estrada testified that although she had met Valladares, she had never hired her to work at Pappasito's. Additionally, Estrada stated that although Batres attended Pappasito's to care for Marina, Batres never cleaned or cooked. According to Estrada, no one cooked at Pappasito's because there was no kitchen and all

7

of the meals were catered. Estrada stated that she had met Sales at a Pappasito's Christmas party and that Sales never cooked or cleaned at Pappasito's.

*3. Munoz's Testimony*

Munoz testified that he met Batres and Sales at Pappasito's because he took his parents there once a week for dances. Munoz testified that Batres was his girlfriend in January and February of 2005. He stated that he had never been given a note by Batres or Sales. He further testified that Batres told him that she and Sales "had gotten together . . . so that they could accuse [Ellilian and Juan] and so that they could get money and . . . visa[s]." Munoz testified that Batres told him that she would pay him if he corroborated her lie by saying that she and Sales were abused and forced to work at Pappasito's. After Munoz refused to lie, Sales threatened to hurt Munoz and his son. Munoz also testified that shortly before the trial, he had started working for a medical supply company owned by Ellilian.

*4. Additional Testimony*

Brenda Martinez Castillo testified that she had introduced Sales to Tristan on October 27, 2004, but that she had met Sales in Matamoros in 1999.

Dora's son, Christian De Leon, testified that he witnessed Sales and Batres leave his mother's home in January 2005. However, instead of fleeing through a window, Christian testified that he watched as Sales and Batres "walked out through the front door."

Reynaldo Munoz Martinez, a man who regularly attended Pappasito's, testified that he had met Batres and Sales at Pappasito's. He testified that Batres would accompany Marina to dances hosted by Pappasito's, but that he never saw Batres clean or cook. Additionally, he testified that Sales also attended the dances, but that he never observed

her cleaning or cooking.

The jury found Ellilian guilty of trafficking Sales, and acquitted her of trafficking Batres.[6] The jury assessed punishment at four years' imprisonment and a $10,000 fine, and recommended suspending imposition of the sentence and placing Ellilian on community supervision for four years. The trial court sentenced Ellilian in accordance with the jury's recommendation. This appeal ensued.

## II. LEGAL AND FACTUAL SUFFICIENCY

In her first and second issues, Ellilian contends that the evidence is legally and factually insufficient to support the jury's verdict. In her third issue, Ellilian contends that the trial court erred in denying her motion for an instructed verdict. Because a motion for an instructed verdict is a challenge to the legal sufficiency of the evidence, we address these issues together. *See Lemoine v. State*, 85 S.W.3d 385, 387 (Tex. App.–Corpus Christi 2002, pet. denied) (citing *Madden v. State*, 799 S.W.2d 683, 686 (Tex. Crim. App. 1990)).

## A.    Standards of Review and Applicable Law

In conducting a legal sufficiency review, we must ask whether "'*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt'—not whether '*it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (emphasis in original)). A jury's verdict will be upheld "unless a rational factfinder [would] have had reasonable doubt as to any essential element." *Id.* at 517. We do not reevaluate the weight and credibility of the evidence, and

---

[6] Juan was tried only for the offense of trafficking Sales and was acquitted by the jury.

we do not substitute our own judgment for the trier of fact. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (en banc); *Beckham v. State*, 29 S.W.3d 148, 151 (Tex. App.–Houston [14th Dist.] 2000, pet. ref'd). We resolve any inconsistencies in the evidence in favor of the judgment. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

In conducting a factual sufficiency review, we review the evidence in a neutral light to determine whether the evidence is so weak that the jury's verdict seems clearly wrong and manifestly unjust or the jury's verdict is against the great weight and preponderance of the evidence. *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). We will not reverse the jury's verdict unless we can say with some objective basis in the record that the great weight and preponderance of the evidence contradicts the verdict. *Id.* at 417. Both legal and factual sufficiency are measured by the elements of the offense as defined by a hypothetically correct jury charge. *See Curry*, 30 S.W.3d at 404; *Adi v. State*, 94 S.W.3d 124, 131 (Tex. App.–Corpus Christi 2002, pet. ref'd).

Section 20A.02 of the penal code provides that a person commits the offense of trafficking of persons when that person "knowingly traffics another person with the intent or knowledge that the trafficked person will engage in forced labor or services." TEX. PENAL CODE ANN. § 20A.02(a)(1). "'Traffic' means to transport, entice, recruit, harbor, provide, or otherwise obtain another person by any means." *Id.* § 20A.01(2) (Vernon Supp. 2008). Section 20A.01 of the penal code provides:

> (1) "Forced labor or services" means labor or services . . . that are performed or provided by another person and obtained through an actor's:
>
> > (A) causing or threatening to cause bodily injury to the person [providing the labor or services] . . . ;

10

(B) restraining or threatening to restrain the person [providing the labor or services] . . . ;

(C) knowingly destroying, concealing, removing, confiscating, or withholding from the person [providing the labor or services] . . . the person's actual or purported:
(i) government records;
(ii) identifying information; or
(iii) personal property;

. . .

(E) threatening to report the person . . . to immigration officials or other law enforcement officials . . . .

*Id.* § 20A.01(1). Restrain means "to restrict a person's movements without consent, so as to interfere substantially with the person's liberty, by moving the person from one place to another or by confining the person." *Id.* § 20.01(1) (Vernon Supp. 2008). Restraint is "without consent" when "it is accomplished by force, intimidation, or deception." *Id.*

The jury was instructed that it could find Ellilian guilty under the law of parties. In order to convict Ellilian of trafficking of persons under the law of parties, the State was required to prove that, with the intent to promote or assist in the offense of trafficking of persons, Ellilian solicited, encouraged, directed, aided, or attempted to aid in the commission of the trafficking of persons. TEX. PENAL CODE ANN. § 7.02(a)(2) (Vernon 2003); *see Hooper v. State*, 214 S.W.3d 9, 14 n.3 (Tex. Crim. App. 2007).

## B. Legal Sufficiency and Motion for an Instructed Verdict

In her first and third issues, Ellilian contends that the evidence is legally insufficient to support the jury's verdict and that the trial court erred by refusing to grant her motion for an instructed verdict. Ellilian begins her legal sufficiency argument by asserting that a

rational jury could not have found her guilty under the law of parties because, by acquitting Juan, the jury found that the evidence was legally insufficient to establish that Juan was the primary actor. Moreover, Ellilian argues that a rational juror could not have found her guilty as the principal because the evidence presented at trial did not prove beyond a reasonable doubt that *she* committed the offense of trafficking of humans. We disagree.

Texas Penal Code section 7.03 provides that "[i]n a prosecution in which an actor's criminal responsibility is based on the conduct of another, the actor may be convicted on proof of commission of the offense and that he was a party to its commission, and it is no defense . . . that the person for whose conduct the actor is criminally responsible has been acquitted, has not been prosecuted or convicted, has been convicted of a different offense or of a different type or class of offense, or is immune from prosecution." TEX. PENAL CODE ANN. § 7.03 (Vernon 2003). Therefore, Juan's acquittal, alone, does not prevent Ellilian's conviction. *See Ex parte Thompson*, 179 S.W.3d 549, 553 (Tex. Crim. App. 2005) (noting that "the acquittal of the principal does not prevent conviction of his accomplice").

Ellilian argues that Sales testified that it was Juan, and not Ellilian, who: (1) offered Sales employment; (2) arranged for a "coyote" to cross Sales; (3) was contacted to "pick-up" Sales once she was in the United States; and (4) "picked-up" Sales in Brownsville shortly after she crossed the border. However, Sales testified as follows:

[State]: How is it that you ended up—you stopped working for Maria Rangel Tristan?

[Sales]: While I was working with her, [Juan] and the lady, [Ellilian], came over. And they offered me work, to come and work for them here in the United States.

. . .

12

| | |
|---|---|
| [State]: | What—what did they tell you? |
| [Sales]: | [Juan] asked me if I wanted to come work with them over here on this side. |
| [State]: | You didn't ask them? |
| [Sales]: | I talked to them when they told me. |
| | . . . |
| [State]: | Now you said they asked you to come work for them? |
| [Sales]: | Yes. |
| [State]: | What did they want you to do? |
| [Sales]: | They told me that if I was to come with them to this side, they would pay me $125 per week for cleaning, the cooking, and caring for the kids. |
| [State]: | And how were you going to get across? |
| [Sales]: | I told them that I didn't have any documents. And they told me that we could take care of it with a pollero, or coyote; that they were going to pay $250, and that here, with work, I would be able to work it off. |

Sales further testified that she worked twenty to twenty-two hours per day at Ellilian's home from mid-November 2004 to early January 2005, and received only one $200 payment. Sales testified that Ellilian threatened to call the police or immigration if Sales did not work, and to deport Sales to Guatemala. Additionally, Sales and Batres testified that when Sales left Ellilian's home to live with Dora, Ellilian refused to allow Sales to take her clothes.

After reviewing the evidence in the light most favorable to the verdict, we conclude that any rational trier of fact could have found the essential elements of trafficking of humans beyond a reasonable doubt. *Hooper*, 214 S.W.3d at 13. Accordingly, the

13

evidence is legally sufficient to support Ellilian's conviction.  Ellilian's first and third issues are overruled.

## C.     Factual Sufficiency

In her second issue, Ellilian argues the evidence is factually insufficient to support the jury's verdict.  The evidence contrary to the verdict is based primarily on conflicting witness testimony.

First, Castillo's testimony that she met Sales in Matamoros in 1999 directly contradicts Sales's testimony that she had not visited Matamoros before 2004.  Moreover, Ellilian presented evidence that Sales was not restrained—Dora's son, Christian, testified that Sales did not leave Dora's house by jumping out of a window, but instead that she ended her employment when she "walked out through the front door."  Additionally, Ellilian presented evidence that Sales's testimony regarding working at Pappasito's was fabricated.  Ellilian, Estrada, and Martinez testified that although Sales attended dances at Pappasito's, she had never worked there.  Estrada also testified that Sales's alleged Pappasito's confidant, Valladares, never worked at Pappasito's.  Further, Estrada testified that neither Valladares nor Sales would have cooked at Pappasito's because there was no kitchen and all of the meals were catered.  Munoz testified that Batres and Sales accused Ellilian of the offense of trafficking persons in order to obtain money and visas.  Munoz further stated that Batres requested that he corroborate their "lie," and that Sales threatened to harm him and his son if he refused to comply.  Munoz also denied passing a note from Sales to Valladares.

Ellilian testified that she did not meet Sales until late November 2004, and that Sales showed her a valid California ID.  Ellilian denied paying to cross Sales into the

14

United States, threatening Sales, denying Sales payment, or treating her poorly. Ellilian testified that, while Sales worked in her home, she provided Sales with clothes purchased from Foley's, and payment of $120 per week. Additionally, Ellilian testified that Sales had "molested" her youngest son.

The jury is the sole judge of the weight and credibility of the evidence and is entitled to resolve conflicts in the evidence. *See* TEX. CODE CRIM. PROC. ANN. art. 36.13 (Vernon 2007). We cannot say that the evidence was so weak that Ellilian's conviction was against the great weight and preponderance of the evidence or manifestly unjust. *See Watson*, 204 S.W.3d at 414-15. Therefore, we conclude that the evidence was factually sufficient. Ellilian's second issue is overruled.

### III. JURY CHARGE

In issues four through eight, Ellilian contends that by failing to specifically instruct the jury that a unanimous verdict regarding "specific acts of conduct" must be reached, (1) the trial court erred and the harm to Ellilian was egregious (issue 4); (2) Ellilian was denied due process rights under the Fifth and Fourteenth Amendments of the United States Constitution (issue 5); and (3) Ellilian was denied a fair and impartial trial guaranteed under: (i) the Sixth Amendment of the United States Constitution (issue 6); (ii) article V, section 13, and article I sections 10 and 19 of the Texas Constitution (issue 7); and (iii) article 36.29(a) of the Texas Code of Procedure (issue 8). Additionally, in her ninth issue, Ellilian contends that the trial court erred by failing to instruct the jury that it must unanimously determine whether she acted as the principal or a party.

### A.     Standard of Review

"Our first duty in analyzing a jury-charge issue is to decide whether error exists."

15

*Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). If error exists, we then determine whether the error harmed the defendant. *Id.* If the defendant properly objected to the erroneous jury charge, reversal is required if we find "some harm" to the defendant's rights. *Id.* If the defendant did not object, we may only reverse if the record shows egregious harm. *Id.* at 743-44.

## B.    "Specific Acts of Conduct"

Ellilian contends that she was deprived of her right to a unanimous jury verdict because the jury was instructed that it could find Ellilian guilty of trafficking Sales if Ellilian (1) transported, (2) enticed, (3) recruited, or (4) otherwise obtained Sales for transport by deception. Ellilian contends that each of these "acts" constitute independent crimes, and that the jury should have been instructed that they must unanimously agree as to the specific "act" that Ellilian committed. The State argues that the offense of trafficking of persons is a result-oriented offense and, therefore, the "different types of conduct" listed in the charge are not separate offenses.

"Both Texas and federal courts have held that the jury must be unanimous in finding that the defendant committed a specific statutory crime." *Landrain v. State*, 268 S.W.3d 532, 536 (Tex. Crim. App. 2008). Unanimity requires "that each and every juror agrees that the defendant committed the same, single, specific criminal act." *Ngo*, 175 S.W.3d at 745. However, "Texas courts have long held that the State may plead alternate 'manner and means' of the commission of the same offense." *Gonzales v. State*, 270 S.W.3d 282, 288 (Tex. App.–Amarillo 2008, pet. ref'd) (citing *Willis v. State*, 29 S.W. 787, 788 (Tex. 1895)); *see also Landrain*, 268 S.W.3d at 535 (noting, "The jury must agree that the defendant committed one specific crime. That does not mean, however, that the jury must

16

unanimously find that the defendant committed that crime in one specific way or even with one specific act.").

"The question of what a jury must be unanimous about is determined by the legislative intent of the applicable statute." *Soto v. State*, 267 S.W.3d 327, 335 (Tex. App.–Corpus Christi 2008, no pet.) (quoting *Santee v. State*, 247 S.W.3d 724, 727 (Tex. App.–Houston [1st Dist.] 2007, no pet.)). Section 20A.02(a)(1) provides that "[a] person commits [the offense of trafficking of persons] if the person . . . knowingly traffics another person with the intent or knowledge that the trafficked person will engage in forced labor or services . . . ." TEX. PENAL CODE ANN. § 20A.02(a)(1). Therefore, we begin our analysis by addressing whether the legislature intended to make "transport, entice, recruit, harbor, provide, or otherwise obtain another person by any means" in section 20A.01(2) "separate elements of the offense [of trafficking of persons] or underlying 'brute facts [or means that] make up a particular element.'" *Jefferson v. State*, 189 S.W.3d 305, 312 (Tex. Crim. App. 2006) (quoting *Richardson v. United States*, 526 U.S. 813, 817-18 (1999)).

One of the "best indicators" of the legislature's intent is the "focus" or gravamen of the offense. *Huffman v. State*, 267 S.W.3d 902, 907 (Tex. Crim. App. 2008). The Texas Court of Criminal Appeals has stated that the "statutory verb defining the criminal act" is generally the criminal act that requires a unanimous verdict. *Ngo*, 175 S.W.3d at 745 n.24. "Traffic" is the statutory verb set forth in section 20A.02(a). TEX. PENAL CODE ANN. § 20A.02(a)(1). The verbs set forth in section 20A.01(2) describe the manner in which a person may "traffic" another individual. *See id.* § 20A.01(2). The focus of the offense of trafficking persons is on whether a person traffics with an intent to effect the result specified in the statute—"that the trafficked person will engage in forced labor or services."

17

*Id.* § 20A.02(a)(1).  Conduct that is criminalized only because of its result requires intent as to that result and is, therefore, a result-oriented offense.  *Gonzales*, 270 S.W.3d at 288.  Therefore, we conclude that, as a matter of law, the offense of trafficking of humans is a result-oriented offense.

Under a "result of conduct" offense, "different types of results are considered to be separate offenses, but different types of conduct are not."  *Huffman*, 267 S.W.3d at 907.  There is no indication that the legislature intended for "transport, entice, recruit, harbor, provide, or otherwise obtain another person by any means" to constitute separate offenses.  *See* TEX. PENAL CODE ANN. § 20A.01(2).  Instead, section 20A.01(2) sets forth alternate methods of trafficking.  *See id.*  Therefore, the trial court did not err by failing to instruct the jury that they must unanimously agree which of the alternate methods Ellilian utilized to traffic Sales.  Ellilian's fourth, fifth, sixth, seventh, and eighth issues are overruled.

## C.     Parties Charge

In her ninth issue, Ellilian contends that the trial court erred by failing to instruct the jury "that its verdict must be unanimous regarding [Ellilian's] guilt as a principal or a party."  The jury charge provided that the jury could find Ellilian guilty if either (1) Ellilian trafficked Sales with the intent that Sales engage in forced labor or services, or (2) Juan trafficked Sales with the intent that Sales engage in forced labor or services, and Ellilian promoted or assisted Juan by soliciting, encouraging, directing, aiding or attempting to aid Juan in the commission of the trafficking.

In reviewing a disjunctive jury charge, we first determine whether the application paragraphs contain different criminal acts or whether they merely instruct as to different means of committing a single offense.  *Holford v. State*, 177 S.W.3d 454, 461 (Tex.

App.–Houston [1st Dist.] 2005, pet. ref'd). Here, both application paragraphs contain the criminal act of trafficking with the intent that the trafficked individual engage in forced labor or services. The trial court's instruction on party liability provides an alternate method by which the jury could find that Ellilian trafficked Sales; it does not set forth a separate criminal act. *See Randall v. State*, 232 S.W.3d 285, 294 (Tex. App.–Beaumont 2007, pet. ref'd) (holding that the unanimity requirement was not violated where the jury was instructed that it could find the defendant guilty of capital murder as a principal or as a party). We conclude that the trial court did not err by failing to instruct the jury that it must unanimously decide that Ellilian acted either as the principal or a party. *See id.* Ellilian's ninth issue is overruled.

## IV. CONCLUSION

Having overruled all of Ellilian's issues, we affirm the trial court's judgment.

_____
ROGELIO VALDEZ
Chief Justice

Do not Publish. TEX. R. APP. P. 47.2(b)
Memorandum Opinion delivered and filed
this the 8th day of October, 2009.

19