In The



Court of Appeals



Ninth District of Texas at Beaumont


____________________



NO. 09-06-198 CR


____________________



EARL FLOYD RANDALL, JR., Appellant



V.



THE STATE OF TEXAS, Appellee






On Appeal from the 221st District Court


Montgomery County, Texas


Trial Cause No. 04-06-04199-CR






OPINION


 Earl Floyd Randall, Jr. appeals his conviction and life sentence for capital murder. 
In eleven points of error, Randall challenges the constitutionality of the mandatory life
sentence, challenges the legal and factual sufficiency of the evidence supporting the
conviction, challenges the overruling of his motion for new trial based upon ineffective
assistance of trial counsel, complains of the admission into evidence of photographs of the
corpse, claims the trial court failed to require a unanimous verdict, and claims the trial court
erred in its instruction on reasonable doubt. We affirm.

 First, Randall argues that the capital murder statute deprives him of due process
because the statute does not provide a vehicle for arguing for mitigation against the
imposition of a life sentence. He contends a life sentence with forty years of parole
ineligibility constitutes cruel and unusual punishment. The capital murder statute under
which Randall was convicted allows for mitigation of punishment. See Act of May 29, 1993,
73d Leg., R.S., ch. 900, § 1.01, sec. 12.31, 1993 Tex. Gen. Laws 3586, 3602 (current version
at Tex. Pen. Code Ann. § 12.31(a) (Vernon Supp. 2006)). In this case, the State did not
seek the death penalty so Randall automatically obtained the benefit of the lesser punishment
available under the statute. Randall concedes that precedent from the United State Supreme
Court forecloses this court from holding his conviction to be contrary to the constitutional
prohibition against cruel and unusual punishment. See Harmelin v. Michigan, 501 U.S. 957,
995-96, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991). Point of error one is overruled.

 Randall's next three points of error challenge the sufficiency of the evidence. Randall
claims the evidence is legally and factually insufficient to establish that he killed the victim. 
He contends the evidence is also legally and factually insufficient to prove that he possessed
the culpable mental state required to be criminally responsible, as a party or as a conspirator,
for the conduct of the person who killed the victim.

 A legal sufficiency review requires us to view the evidence in the light most favorable
to the verdict and determine whether any rational trier of fact could have found the essential
elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307,
318-19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Ross v. State, 133 S.W.3d 618, 620 (Tex.
Crim. App. 2004). In reviewing the evidence for factual sufficiency, we consider all the
evidence in a neutral light to determine whether the evidence supporting the verdict is so
obviously weak as to undermine confidence in the jury's determination, or whether the
evidence of guilt, although adequate if considered alone, is so greatly outweighed by contrary
proof that the jury's verdict is not rationally justified. Johnson v. State, 23 S.W.3d 1, 11
(Tex. Crim. App. 2000); see also Watson v. State, 204 S.W.3d 404, 414-15, 417 (Tex. Crim.
App. 2006).

 Randall limits his legal sufficiency arguments to the proof that he killed the victim. 
The trial court instructed the jury on the law of parties. Thus, Randall's conviction may be
upheld upon proof that the offense was committed "by his own conduct, by the conduct of
another for which he is criminally responsible, or by both." Tex. Pen. Code Ann. § 7.01(a)
(Vernon 2003). A person is criminally responsible for an offense committed by the conduct
of another if, "acting with intent to promote or assist the commission of the offense, he
solicits, encourages, directs, aids, or attempts to aid the other person to commit the
offense[.]" Tex. Pen. Code Ann. § 7.02(a)(2) (Vernon 2003). "If, in the attempt to carry
out a conspiracy to commit one felony, another felony is committed by one of the
conspirators, all conspirators are guilty of the felony actually committed, though having no
intent to commit it, if the offense was committed in furtherance of the unlawful purpose and
was one that should have been anticipated as a result of the carrying out of the conspiracy." 
Tex. Pen. Code Ann. § 7.02(b) (Vernon 2003).

 Randall does not contend that the evidence that he acted as a party or as a co-conspirator to the offense is legally insufficient. The charge authorized the jury to convict
based upon Randall's culpability as a party to the offense, and Randall addresses the
evidence supporting the parties charge only in his factual sufficiency issues. A factual
sufficiency review begins with the presumption that the evidence is legally sufficient under
Jackson v. Virginia. Clewis v. State, 922 S.W.2d 126, 134, 136 (Tex. Crim. App. 1996). 
Therefore, Randall effectively concedes the legal sufficiency of the evidence supporting his
conviction under the law of parties. The law of parties applies to the capital murder statute. 
Johnson v. State, 853 S.W.2d 527, 534 (Tex. Crim. App. 1992); Fuller v. State, 827 S.W.2d
919, 932 (Tex. Crim. App. 1992). "The principle is well-established that when the jury
returns a general verdict and the evidence is sufficient to support a guilty finding under any
of the allegations submitted, the verdict will be upheld." Fuller, 827 S.W.2d at 931. 
Because a conviction may be had upon a theory of prosecution the legal sufficiency of which
is not challenged by the appellant, Randall's argument based upon Jackson v. Virginia fails.

 Next, we turn to Randall's claim that the evidence is factually insufficient to support
the jury's finding of his guilt as a primary actor, as a party, or as a co-conspirator. The
evidence used to establish Randall's culpability includes Randall's own statement, the
testimony of a juvenile eyewitness who received immunity, and the testimony of an
incarcerated person. Randall does not argue that the State established insufficient
corroboration under either the corpus delicti rule or the accomplice witness rule. See Salazar
v. State, 86 S.W.3d 640, 644-45 (Tex. Crim. App. 2002); Tex. Code Crim. Proc. Ann. art.
38.14 (Vernon 2005). Focusing on the element of intent, Randall argues that the evidence
"is at least equally supportive" that he "acted with a benevolent purpose" by helping to
remove the victim from the immediate presence of Robert Huggins, the person with the intent
to kill the deceased.

 Robert Huggins owned a tattoo parlor. A parlor employee who worked as a tattoo
artist testified that on the night of the murder he, Huggins, an apprentice tattooer, and two
young women were present at the tattoo parlor. He testified that he left to eat with one of the
young women and that they returned to find Huggins exhibiting a pistol and the victim was
lying on the ground with duct tape over his eyes and mouth. Huggins was angry because the
victim had stolen from him. The tattoo artist kicked the victim "out of disrespect," and then
Huggins kicked the victim four or five times and struck him with the butt of a pistol. Randall
and David South arrived. Huggins gave Randall some car keys and Randall walked outside.
When Randall returned, three men dragged the victim out of the door. At some point late in
the exchange, Huggins stabbed the victim with a fork and by dragging the utensil created two
long wounds down the length of the victim's back. Huggins gave South a backpack that
contained the victim's gun. Randall and South were there for less than fifteen minutes. 
According to the tattoo artist, no one threatened either Randall or South.

 The tattoo apprentice, who was fifteen years of age at the time of the murder, testified
on a grant of immunity. According to the apprentice, the customers at the tattoo parlor
wanted to obtain drugs. Huggins sent the victim out to obtain drugs, but the victim returned
thirty minutes later and claimed he had been cheated. Huggins found his own marked bills
in the victim's wallet. Realizing the victim had pocketed Huggins' money, Huggins struck
the victim on the forehead with the butt of a .357 handgun. Randall used the victim's belt
to tie the victim's hands behind him. Huggins stripped the victim of his jewelry and put it
in a bag. Huggins kicked the victim, then gave the tape to the apprentice, who wrapped the
tape around the victim's face to quiet the victim. Huggins cut a slit in the tape so the victim
could breathe. While the victim was on the floor, Huggins, the apprentice, South, and
Randall all assaulted the victim. Randall pulled the victim's car up to the door and Huggins
and the apprentice carried the victim out. The victim caught his feet on the door jamb and
struggled "because he didn't want to go in the car." Huggins stabbed the victim with a fork
and dragged the fork down the victim's back. Randall and South put the victim in the car.
According to the apprentice, Randall and South came to the tattoo parlor because Huggins
called them, and Huggins did not threaten them. The apprentice claimed he had never seen
Randall and South before.

 During the investigation, Randall claimed that he had been doing electrical work at
Robert Huggins' tattoo parlor and that he arrived at 5:30 a.m. In one statement taken by a
detective, Randall admitted that he tied up the victim. As recounted in one of the appellant's
videotaped statements, Randall left Huggins' tattoo parlor, met with South, and the two
proceeded to the tattoo parlor. The victim asked Huggins what he could do to make things
right, and Huggins replied that "you can die." Huggins said that he did not want the victim
to be found. Randall backed the victim's car up to the side door of the tattoo parlor, opened
the trunk of the car, and watched as South placed the struggling victim in the trunk. Randall
left in his vehicle, followed by South in the victim's car. Randall's vehicle broke down and
he transferred to South's vehicle. They heard a noise in the trunk and stopped the vehicle. 
South stabbed the victim repeatedly for about three minutes. They drove to a trash pile in an
oil field and dumped the body there. They drove to South's residence, retrieved a minivan,
bought some gasoline, and drove the minivan and the victim's car to a pipeline where South
set fire to the victim's car. They went to a carwash, washed the minivan and the murder
weapon, then sold the knife for $20.

 The victim was stabbed over ninety times, mostly in the head, neck and chest, and
bore a number of defensive wounds on his arms. The victim also had blunt force trauma
injuries and one of his ears was severed from his body. One of the stab wounds pierced the
skull and entered the brain, another pierced and deflated an eyeball, others passed completely
through his hands and nearly severed a finger, and both lungs were perforated. Most of the
wounds had been delivered while the subject was alive. The cause of death was multiple
sharp force injuries causing loss of blood in the chest cavity and trachea area and injury to
the brain. The body was not bound when it was recovered by the authorities. A belt circled
his waist but was not connected to his pants. Randall's left palm print was recovered from
the victim's car.

 A man who was confined in the county jail with Randall after Randall's arrest testified
that Randall admitted to him that the victim had been killed because he cheated Huggins "for
some money on some drugs." The witness claimed that Randall admitted to him that they
pistol-whipped the victim and tied him up. Then Huggins told Randall to get his brother-in-law, South, "because they wanted to get rid" of the victim. They surreptitiously removed the
victim because the place was being watched. Randall admitted that they "did a little bit of
dope" out on Oil Field Row, "and he gave his brother-in-law a large knife with a deer head
handle" that South used to repeatedly stab the victim. Randall thought he would "just get a
kidnapping charge" because his brother-in-law "was kind of slow so he wouldn't have to get
his hands dirty." The witness claimed Randall stated that he received $300 and was supposed
to receive some drugs and the victim's gun.

 Randall contends the State "has simply not produced clear proof that he was trying to
help South kill the victim, or even kidnap him." Randall himself admitted to personally tying
the victim's hands behind him very early in the course of events that culminated in murder. 
He admitted that Huggins had a gun on the victim at the time, so the restraints were not
necessary to secure the safety of the people in the room. Randall also admitted that he
brought South to the scene at the behest of Huggins. Although Randall claimed he did not
know what Huggins wanted South to do, by Randall's account the rest of the events
transpired very quickly and without discussion or deliberation other than Huggins's statement
to the victim that "[y]ou can die" and Huggins's admonishment to South that Huggins did
not want the victim to be found. Although Randall denied it, the jury could reasonably infer
that Randall did communicate to South their purpose in going to the tattoo parlor at 6:00 a.m. 
Randall admitted that he backed the victim's car up to the side door of the parlor and opened
the trunk from inside the vehicle, and claimed that he remained in the vehicle while South
put the victim in the trunk. Since people are usually transported in a vehicle's passenger
compartment, the fact that Randall knew the victim would be traveling in the trunk indicates
that he was aware that the victim was not going for a ride in the ordinary sense of the term. 
The victim struggled to avoid leaving with Randall, even though the person who tortured and
menaced him remained at the shop. The victim had the most at stake in misreading the
intentions of those around him, and clearly did not voluntarily leave with Randall and South. 
The jury could infer the victim perceived that Randall and South meant to harm him. Again
by his own admission, Randall drove the victim's car out to a remote area where people
discard refuse, stopped the car, either opened the trunk or gave South the keys and watched
while South stabbed the victim over ninety times. Randall then helped dispose of the
victim's vehicle and the murder weapon. Accepting his own version of the events, Randall
actively participated in restraining and secreting the victim and aided South in the
commission of the murder. No evidence from any source indicates that Huggins or South
threatened Randall if he failed to cooperate.

 Although Randall presented himself as a peripheral participant, the other witnesses
described a more active role in the kidnapping and murder. One witness testified that
Randall assaulted the victim in the tattoo parlor and helped South carry the victim out to the
trunk. Another witness claimed Randall told him that Huggins told Randall to get South to
help "get rid" of the victim and that Randall gave the murder weapon to South once they
arrived at the refuse heap. These details were absent from all of Randall's statements to the
investigators, but the jury could find that Randall omitted significant details in order to make
himself appear less culpable.

 Proof of the defendant's culpable mental state is typically established by inference
from circumstantial evidence. Dillon v. State, 574 S.W.2d 92, 94 (Tex. Crim. App. 1978). 
Randall likens his case to Vodochodsky v. State and suggests he could have intended to
release the victim in a safe place. See Vodochodsky v. State, 158 S.W.3d 502 (Tex. Crim.
App. 2005). In Vodochodsky, the Court of Criminal Appeals noted the absence of any
evidence that the defendant actually did any affirmative act to assist the shooter in the
execution of his plan to kill police officers. Id. at 511. Randall, by way of contrast, by his
own admission restrained the victim, assisted in secreting the victim in the trunk, transported
the victim to a remote area where the murder occurred, and helped destroy evidence. 
Furthermore, the jury could have found the other witnesses' testimony to be more credible
than Randall's. All of Randall's actions indicate an awareness of the victim's peril and none
of his actions suggest any reticence on his part. Nothing about this record undermines our
confidence in the jury's determination of Randall's guilt. We hold the evidence is factually
sufficient to establish Randall's culpability as a party to the offense of capital murder. Points
of error two through four are overruled.

 Randall's next two points of error contend that the trial court erred by refusing to
order a new trial "where Appellant's trial counsel needlessly elicited testimony that Appellant
was housed in a part of the jail reserved for pedophiles" and that the trial court erred by
refusing to conduct a hearing or otherwise permit claim development on Randall's motion
for new trial. Although Randall's motion for new trial contained a certificate of presentment
that stated a copy of the motion had been either mailed or hand delivered to the judge's
chambers, the motion does not contain a request that the trial court conduct an evidentiary
hearing. Randall filed his request for a hearing after the trial court signed the order denying
the motion for new trial. The "reviewing court does not reach the question of whether a trial
court abused its discretion in failing to hold a hearing if no request for a hearing was
presented" to the trial court before it rules on the motion. Rozell v. State, 176 S.W.3d 228,
230 (Tex. Crim. App. 2005).

 A claim of ineffective assistance must be firmly founded in the record. Bone v. State,
77 S.W.3d 828, 835 (Tex. Crim. App. 2002). Randall's claim of ineffective assistance
concerns trial counsel's cross-examination of the person who testified that Randall made
incriminating admissions while housed in the county jail. Defense counsel asked the witness,
"Did they put pedophiles in the general population?" The prosecutor objected, and defense
counsel rephrased the question to ask, "Do they put people who are convicted of the offense
for which you have been convicted in general population?" The witness replied, in part, that
"[a]ll of us that are on that pod in that section all have to have some kind of sex offense
regardless of the technicalities of it." Defense counsel's question appears to be aimed at
establishing that the witness has been convicted of a sexual offense against a child and at
casting doubt upon the witness's claim that he came into contact with a person not charged
with a sexual offense. Neither the question nor the response refers to the accused or suggests
that Randall is a pedophile. The record does not support Randall's claim that trial counsel's
cross-examination needlessly elicited evidence that Randall was housed in a part of the jail
reserved for pedophiles. Points of error five and six are overruled.

 Randall's next two points of error contend that the trial court erred in admitting into
evidence photographs of the victim taken at the crime scene and at the autopsy. At trial, he
objected that the photographs were more prejudicial than probative. See Tex. R. Evid. 403. 
On appellate review we consider: (1) the number of photographs; (2) their size; (3) whether
they are in color or black and white; (4) the detail shown; (5) their gruesomeness; (6) whether
the body is naked or clothed; and (7) "whether the body has been altered since the crime in
some way that might enhance the gruesomeness of the photograph to the appellant's
detriment." Shuffield v. State, 189 S.W.3d 782, 787 (Tex. Crim. App.), cert. denied, 127
S.Ct. 664, 166 L.Ed.2d 521, 75 U.S.L.W. 3283 (2006). Seven photographs are at issue. The
trial court allowed two of four offered photographs depicting the corpse as it was found at
the dump site. Two autopsy photographs establish the defensive wounds to the hands, two
autopsy photographs show the offensive wounds to the head and neck, and one autopsy
photograph shows the wound Huggins inflicted with a fork. The photographs are in color
but do not depict internal organs or show damage to the corpse resulting from the autopsy
as opposed to the attack. The victim's genitals are not exposed in any of the exhibits. On
appeal, Randall contends the photographs are unfairly prejudicial because they are gruesome
and depict wounds not inflicted by Randall. A corpse with over ninety stab wounds is an
appalling sight, but the photographs show only the wounds inflicted in the course of the
murder. That the wounds were inflicted by South and Huggins does not make the
photographs unfairly prejudicial in the prosecution of Randall as a party to the murder. The
trial court's ruling that the probative value of the photographs outweighs any unfair
prejudicial effect is within the zone of reasonable disagreement. We hold the trial court did
not abuse its discretion in admitting the exhibits into evidence. Points of error seven and
eight are overruled.

 Randall's next two points of error contend that the trial court erred by failing to
require the State to obtain a unanimous verdict of guilty on a single prosecutorial theory. 
Randall concedes he did not raise the issue in the charge conference, but argues that both
the Texas Constitution and United States Constitution require the trial court to obtain
separate jury findings on the three theories of criminal responsibility submitted to the jury.
See Ngo v. State, 175 S.W.3d 738, 750-52 (Tex. Crim. App. 2005) (applying egregious harm
standard to claim of lack of jury unanimity). Randall concedes that the Court of Criminal
Appeals rejected a similar argument where two aggravating offenses were submitted in a
single capital murder. See Kitchens v. State, 823 S.W.2d 256 (Tex. Crim. App. 1991). 
Kitchens is distinguishable, he argues, because in his case the manner and means of the
killing is the same in all three theories submitted to the jury. That distinction does not justify
requiring separate submission of party liability. Holford v. State, 177 S.W.3d 454, 462-63
(Tex. App.--Houston [1st Dist.] 2005, pet. ref'd) (parties' charge in capital murder
prosecution authorized conviction based upon transferred intent related to same actus reus);
Hanson v. State, 55 S.W.3d 681, 694-95 (Tex. App.--Austin 2001, pet. ref'd) (parties' charge
described two ways to commit the same capital murder).

 A general verdict suffices unless the alternate theories involve the commission of
separate criminal acts. See Ngo, 175 S.W.3d at 745 (credit card abuse by stealing, receiving,
or presenting card); Francis v. State, 36 S.W.3d 121, 125 (Tex. Crim. App. 2000) (indecency
by breast-touching or genital-touching). Although the indictment in Ngo alleged the
commission of three acts that were all credit card abuse offenses, they were not committed
at the same time or with the same mens rea and the same actus reus. Ngo, 175 S.W.3d at
744-45. The jury charge in Ngo erroneously permitted the jury to convict if some of the
jurors believed the accused stole the credit card but found reasonable doubt that he presented
the card, while the remaining jurors could believe the evidence to be sufficient to establish
that the accused presented the card but not that he stole it. Id. Similarly, in Francis the
erroneous jury charge made it possible for part of the jury to convict only on the
breast-touching offense while the rest of the jury believed him to be innocent of that offense
but believed him to be guilty of the genital-touching offense. Francis, 36 S.W.3d at 125. 
Both cases raised the possibility that the jury convicted the accused without having been
unanimously convinced of his guilt beyond a reasonable doubt.

 This infirmity is not present if the theories presented in the charge involve different
ways of committing the same offense. For instance, in Jefferson v. State, the father of a child
who died of a head injury was convicted on a verdict that did not distinguish between guilt
by commission and guilt by omission. Jefferson v. State, 189 S.W.3d 305, 309, 313-14 (Tex.
Crim. App. 2006), cert. denied, 127 S.Ct. 386, 166 L.Ed.2d 276, 75 U.S.L.W. 3195 (2006). 
The Court of Criminal Appeals held the charge did not authorize conviction upon a less than
unanimous verdict. Part of the jury could believe the accused actually inflicted the fatal
injury while others might have believed that he failed to summon emergency services for the
injured child, but both the act and the omission "involve the same injury to the same child
during the same transaction with a similar level of culpability." Id. at 313.

 Without citing authority, Randall argues that traditional notions of due process require
that the verdict show what the defendant did wrong and how he became responsible for the
conduct of another. Thus, he contends, the jury must unanimously agree upon whether
Randall acted alone, as a party, or as a co-conspirator. This case is conceptually much closer
to Jefferson than to either Ngo or Francis. Six of the jurors could believe that Randall
inflicted some of the ninety stab wounds, while six of the jurors could believe that Randall
bound and then drove the victim out to the killing field and watched while South ended the
victim's life. Either way, Randall is responsible for the death, whether by his own hand or
by South's. Points of error nine and ten are overruled.

 The final point of error claims the trial court erred in its jury charge by submitting "a
diluted version of the beyond-a-reasonable-doubt standard of proof." Randall did not object
to the charge, which instructed the jury that "[i]t is not required that the prosecution prove
guilt beyond all possible doubt; it is required that the prosecution's proof excludes all
'reasonable doubt' concerning the defendant's guilt." Randall's exact argument was
considered and rejected by the Court of Criminal Appeals in another capital murder appeal. 
See Woods v. State, 152 S.W.3d 105, 114-15 (Tex. Crim. App. 2004), cert. denied, 544 U.S.
1050, 125 S.Ct. 2295, 161 L.Ed.2d 1092 (2005). We overrule point of error eleven and
affirm the judgment.

 AFFIRMED.



 _____________________________

 STEVE McKEITHEN

 Chief Justice


Submitted on March 28, 2007

Opinion Delivered July 25, 2007

Publish


Before McKeithen, C.J., Gaultney and Kreger, JJ.