

# NUMBER 13-09-00163-CR

# COURT OF APPEALS

# THIRTEEN DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**DIMAS DANIEL GONZALEZ ZAMORA,**                    **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                   **Appellee.**

---

### On appeal from the 139th District Court
### of Hidalgo County, Texas.

---

# MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Benavides and Vela
### Memorandum Opinion by Chief Justice Valdez

A jury found appellant, Dimas Daniel Gonzalez Zamora, guilty of attempted capital murder, a first-degree felony, and capital murder. *See* TEX. PENAL CODE ANN. § 15.01 (Vernon 2003), § 19.03(a)(7), (8) (Vernon Supp. 2009). The jury assessed punishment at fifty-five years' imprisonment for the offense of attempted capital murder, and because the State did not seek the death penalty, the trial court assessed punishment for the offense of capital murder at life imprisonment without the possibility of parole. *See id.* §§

12.31(a)(2), 12.32 (Vernon Supp. 2009). By six issues, Zamora contends that: (1) he received ineffective assistance of counsel; (2) the trial court erred in denying his request for a manslaughter instruction; and (3) the trial court erred in failing to instruct the jury that it must reach a unanimous verdict. We affirm.

## I. BACKGROUND

Shortly after 10:00 p.m., on Tuesday, July 29, 2008, Maria Vargas, drove home from a soccer match in Pharr, Texas with her common-law husband, Amador Garibay, their three-year old daughter, Yaritza Garibay, and two friends, Christina Meza and Emiliano Alcazar. After driving a short distance, Vargas turned her yellow Volkswagen north onto Sugar Road off of Owassa Road. A white Ford Taurus that Vargas had noticed following her since leaving the soccer field passed and pulled in front of her Volkswagen and stopped. Two individuals exited the Taurus, fired repeatedly at Vargas's vehicle, re-entered the Taurus and drove away. Eighteen bullet casings and one bullet were later found at the scene. After the shooting ceased, the occupants of the Volkswagen realized that Meza was injured and that three-year-old Yaritza had been shot in the head. Yaritza was subsequently pronounced dead at Edinburg Children's Hospital.

After conducting an investigation, Hidalgo County Sheriff's officers named Zamora as a suspect. On August 4, 2008, Investigator Fernando Tanguma spoke to Zamora's wife to determine Zamora's whereabouts. Investigator Tanguma testified that during their conversation, Zamora's wife received a call from Zamora on her cellular telephone. Zamora's wife asked him where he was and asked him to call Investigator Tanguma. Zamora's wife told Investigator Tanguma that the telephone number that Zamora called from appeared to originate in Monterrey, Mexico.

Ten to fifteen minutes later, Zamora phoned Investigator Tanguma. Investigator

2

Tanguma explained to Zamora that he was conducting an investigation and wanted to speak to him. Zamora denied having anything to do with the shooting and refused to tell Investigator Tanguma where he was. Over the next several days, Investigator Tanguma spoke to Zamora over the phone, and on August 7, 2008, Zamora informed Investigator Tanguma that he was on his way back from Mexico and that he was "going to turn himself into [sic] [Investigator Tanguma]." That afternoon, Investigator Tanguma received a call advising him that Zamora was detained at the port of entry in Hidalgo, Texas. Zamora was later released to Investigator Tanguma and transported to the Hidalgo County Sheriff's office.

Zamora gave a statement to Tanguma that was admitted and read into evidence, without objection, during trial. Zamora's statement provides, in pertinent part, as follows:

> On Tuesday[,] July 29, 2008[,] . . . [a]t about 9:30 p.m. Favio [later identified as Juan Favio Chipres Torres, herein referred to as "Favio"] told me to take him to the soccer field because he wanted to see his girlfriend. We left with Liz and Jorge. I was driving the 1999 white Taurus[.] Favio was in the front passenger seat. Liz was sitting on the rear passenger seat and Jorge was sitting in the rear sear behind me. . . . Favio called someone on the phone when we were driving to the soccer field. We arrived at the soccer field and I parked on the west side of the parking lot. Favio told me that he was going to talk to his girlfriend and stepped out of the car. I saw Favio enter the indoor soccer field. Several minutes later[,] I decided to use the restroom. As I was getting out of the car I saw Favio walking back to the car. I asked Favio if he spoke to his girlfriend and he said he did. I walked into the restroom and then returned to the car. I remember that I saw a yellow Volkswagen parked in the parking lot of the soccer field. The car caught my attention because of the color. I got back into the car and Favio told me to leave. As I was driving out of the parking lot I noticed several other cars also leaving. I turned west on Owassa Road towards Expressway 281. As I got to the intersection of Expressway 281 and Owassa Road[,] I was about to turn south when Favio told me to continue west on Owassa Road. I remember several cars were in front of me. I got to the intersection of Owassa Road and Sugar Road[;] Favio told me to turn north on Sugar Road. Favio then told me to overtake the yellow Volkswagen. At the same time[,] I felt that Jorge placed a gun to my head because I felt the pressure of the barrel against my head. Favio yelled at me to stop in front of the Volkswagen and block it. I noticed that Favio was also pointing a gun at me. Favio said that they would kill me if I didn't do what they said. It was the [.]38

3

[S]uper with the engraving on it. I stopped in front of the Volkswagen and they stopped behind me. Favio and Liz got out of the car and started to shoot at the Volkswagon. Favio and Liz both returned back to the Taurus and tried to get into the front seat. They ran into each other and then Favio got into the front passenger seat, Liz got into the back seat. Favio yelled at me to drive off. Jorge kept the gun to my head. Favio and Jorge threatened me with the guns and said that they would kill me and my family if I didn't drive where they said. . . . I drove [n]orth on Sugar[,] then Favio made me turn left on Alberta Road. As I was driving west[,] Favio made me turn onto several streets. Jorge continued to threaten me with the gun pressing against my head. I remember that we almost were out of gas and the car started to stall so we went to the Stripes on Business 83 and 10th [S]treet. Favio gave me $20.00 to go inside and pay for gas. I returned and filled the car with $20.00 of gas. I then drove south on 10th Street to the Expressway. . . . Favio continued to threaten me and my family. . . . I then exited onto Shary Road . . . and drove into the Wal-Mart parking lot. I parked in the parking lot and Favio, Jorge, and Liz got out and walked over to McDonald[']s. After around twenty minutes, I called my wife[,] Monica[,] to come for me. Monica came and got me and we started to leave. Favio called me and told me to hold on. Favio, Jorge and Liz came back and got into my wife's Jeep. We then went back to our house.

On Wednesday[,] July 30th, in the morning[,] me and Favio went back to the Wal-Mart and picked up the 1999 Taurus. Favio said that it needed to be cleaned. That afternoon me and Monica took the two [.]38 Super pistols and a shotgun that belonged to Favio to my friend[']s house. Favio had wrapped the pistols in a white t[-]shirt and clear tape. Favio told me to take the guns over to Gilberto's house. Favio told me that he knew Gilberto could be trusted. Favio told me that I had to leave my [stepson] . . . at the house and indicated that harm would come to my step son if I did not deliver the guns to my friend. On that same date[,] my wife and I drove to Gilberto's house to leave the guns. . . . We arrived at Gilberto's house[,] and I told him that I was leaving out of town and asked him to take care of the guns. I was told by Gilberto that he would place the guns in the attic so his wife would not find them. . . . I then went back home and Favio told me to give Jorge and Liz a ride to the bus station and to not ask any questions. Jorge and Liz packed their bags[,] and I took my wife's Jeep and went to the [b]us station in McAllen to drop them off.

On Thursday, July 31, 2008[,] Favio told me we needed to leave to Mexico. My wife took me and Favio to the bus station in McAllen. We left to Monterrey[,] Nuevo Leon.

On cross-examination, Investigator Tanguma testified that he had collected no evidence that Zamora fired shots at Vargas's Volkswagen on July 29, 2008.

4

Vargas testified that sometime before the July 29, 2008 shooting, her friend, Jose Silva, was involved in a shooting at a "cock fight." Belsario Mendoza, a member of Zamora's brother-in-law's family, believed that Silva had shot at him during the fight. Vargas testified that Silva had been arrested and that she and Garibay bailed him out and helped him find an attorney. Vargas stated that on the Thursday evening before the shooting, Mendoza approached her at the soccer field and asked if she had a "problem" with him. Vargas replied that she did not. Vargas testified that Mendoza placed a telephone call to someone, though she was not sure to whom, after their encounter. Later that evening, Vargas noticed a man sitting alone in a truck in the parking lot of the soccer field "watching" her. Vargas testified that she did not recognize the man, but that she later saw a picture of Zamora on television and identified him as the man who had watched her in the parking lot. Vargas testified that she did not know Zamora but that she had been acquainted with his friend, Favio. According to Vargas, she had not spoken to Favio in nine or ten years, but she thought that she recognized him as one of the individuals who shot at her Volkswagen on July 29, 2008.

On cross-examination, Vargas stated that she gave two affidavits to investigators and that the second affidavit does not identify Favio as a gunman or mention her encounter with Mendoza.

The State presented the testimony of eleven additional witnesses. No witnesses were presented by the defense. After deliberation, the jury found Zamora guilty of attempted capital murder and capital murder. This appeal ensued.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

In issues one through four, Zamora contends that he received ineffective assistance

5

of counsel during the guilt-innocence stage of trial.

## A.    Standard of Review

Although the constitutional right to counsel ensures the right to reasonably effective counsel, it does not guarantee errorless counsel whose competency or accuracy of representation is to be judged by hindsight. *Rylander v. State*, 101 S.W.3d 107, 110 (Tex. Crim. App. 2003). To prove ineffective assistance of counsel, Zamora must show that (1) counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's error, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999); *Jaynes v. State*, 216 S.W.3d 839, 851 (Tex. App.–Corpus Christi 2006, no pet.). A failure to make a showing under either prong of the *Strickland* standard defeats a claim of ineffective assistance of counsel. *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009).

Zamora must prove his claim of ineffective assistance of counsel by a preponderance of the evidence. *See Stafford v. State*, 813 S.W.2d 503, 506 n.1 (Tex. Crim. App. 1991). "In assessing a claim of ineffective assistance, an appellate court 'must indulge a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance; that is, the [appellant] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" *Williams*, 301 S.W.3d at 687 (quoting *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)). Whether the *Strickland* test has been met is to be judged on appeal by the totality of the circumstances, not by any isolated acts or omissions. *Jaynes*, 216 S.W.3d at 851.

Direct appeal is usually an inadequate vehicle for raising such a claim because the record is generally undeveloped.  *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005); *see Robinson v. State*, 16 S.W.3d 808, 813 n.7 (Tex. Crim. App. 2000) (noting that "only in rare cases will the record on direct appeal be sufficient for an appellate court to fairly evaluate the claim").  Trial counsel should ordinarily be afforded an opportunity to explain his or her actions before being denounced as ineffective.  *Goodspeed*, 187 S.W.3d at 392.  To warrant reversal without affording counsel an opportunity to explain his actions, "the challenged conduct must be 'so outrageous that no competent attorney would have engaged in it.'"  *Roberts v. State*, 220 S.W.3d 521, 533 (Tex. Crim. App. 2007) (quoting *Goodspeed*, 187 S.W.3d at 392).

## B.     Failure to Seek Duress Instruction

In his first issue, Zamora contends that he received ineffective assistance of counsel by trial counsel's failure to request a jury instruction on the affirmative defense of duress.[1] Zamora argues that because trial counsel did not urge a motion to suppress or challenge the admission of Zamora's statement, "trial counsel's trial strategy must have been to adduce these facts in order to entitle Appellant to a jury instruction on duress."  Zamora also argues that trial counsel's subsequent failure to seek an instruction on duress was not acceptable trial strategy.  By asserting that counsel allowed Zamora's statement to be admitted in order to present the evidence necessary to support a duress instruction,

---

[1] A defendant is entitled to an instruction of every defensive issue raised by the evidence, regardless of the strength of that evidence.  *Hayes v. State*, 728 S.W.2d 804, 807 (Tex. Crim. App. 1987).  The duress defense is applicable to a case in which the defendant "engaged in the proscribed conduct because he was compelled to do so by threat of imminent death or serious bodily injury to himself or another."  TEX. PENAL CODE ANN. § 8.05(a) (Vernon 2003).  This affirmative defense is not available to a defendant if he intentionally, knowingly, or recklessly placed himself in a situation in which it was probable that he would be subject to compulsion.  *Id.* § 8.05(d).  Compulsion exists only if the force or threat of force would render a person of reasonable firmness incapable of resisting the pressure.  *Id.* § 8.05(c).

Zamora encourages us to speculate as to the reasons counsel opted not to contest Zamora's statement. He then asks us to assume, based on the previous speculation, that he was entitled to an instruction on duress and that trial counsel was ineffective for failing to ask for a duress instruction. We will not engage in such speculation. *See Bone v. State*, 77 S.W.3d 828, 835-36 (Tex. Crim. App. 2002).

Because Zamora did not file a motion for new trial and did not elicit any testimony regarding trial counsel's reasons for taking the complained-of actions, there is no evidence in the record that the actions of Zamora's trial counsel were not the result of sound and reasonable trial strategy. *See Jaynes*, 216 S.W.3d at 855. Without this specific evidence of trial counsel's decision-making process and strategy, we cannot conclude that Zamora has overcome the strong presumption that his trial counsel provided professional, objectively reasonable assistance. *See Thompson*, 9 S.W.3d at 813. Because Zamora did not establish that his trial counsel's performance fell below an objectively reasonable standard, he has not met the first prong of *Strickland*. *See Jaynes*, 216 S.W.3d at 855. Zamora's first issue is overruled.

## C.     Failure to Question Juror Number 3 Regarding Unauthorized Communication

In his second issue, Zamora asserts that he received ineffective assistance by trial counsel's failure to throughly investigate an unauthorized communication's affect on Juror Number 3.

During the lunch break on the first day of testimony, a member of Zamora's family asked Juror Number 2 if she could borrow Juror Number 2's cell phone. A hearing was conducted to determine the communication's affect on Juror Number 2. At the hearing, Juror Number 2 stated that she was with Juror Number 3 during a break when a female

8

asked to use her phone. Not realizing that the female was a member of Zamora's family, Juror Number 2 complied; however, upon realizing that she had spoken to a member of Zamora's family, Juror Number 2 notified the court. Juror Number 2 informed the trial court that because a call had been placed from her phone she felt "nervous." She also asked to be removed from the jury because she "really [didn't] want to be identified, or have anybody be able to connect [her] with a serious case like this one." Trial counsel requested that the trial court disable Juror Number 2, the State agreed, and the trial court replaced her with an alternate juror.

The trial court then called Juror Number 3 and questioned her as follows:

| The Court: | Did you have any type of problems during lunch? You foresee any problems during lunch? |
|---|---|
| Juror [Number 3]: | Not really. Just somebody came up to me and talked to me about my hair. That it was real nice and— |
| The Court: | But that's not going to influence you in any way? |
| Juror [Number 3]: | No. |
| The Court: | You don't know who it is? |
| Juror [Number 3]: | No. |
| The Court: | You don't have any connection about anybody? |
| Juror [Number 3]: | No. |

The State and trial counsel informed the trial court that they did not have any questions for Juror Number 3, and no one requested that she be disabled.

On appeal, Zamora argues that trial counsel was ineffective for failing to question Juror Number 3 to determine whether she was affected by the unauthorized

9

communication. According to Zamora, trial counsel's "failure to investigate" Juror Number 3 allowed her "to taint the rest of the jury by the same fear and bias that disabled [J]uror [N]umber 2." The record reflects that Juror Number 3 told the trial court that she had not seen any problems during lunch and gave no indication that she shared, or was aware of, Juror Number 2's fear or bias. The record is silent regarding trial counsel's reason for not questioning Juror Number 3, and Zamora has failed to overcome the strong presumption that trial counsel's conduct fell within the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689; *Jaynes*, 216 S.W.3d at 851. Zamora's second issue is overruled.

## D. Extraneous Offense

In his third and fourth issues, Zamora contends that he received ineffective assistance of trial counsel because counsel "opened the door" to the State's inquiry about a previous attempted murder conviction and failed to seek an "adequate" limiting instruction.

### 1. Pertinent Facts

During its case-in-chief, the State called Veronica Sanchez, who testified that sometime after July 29, 2008, she gave consent to police to search her home for guns believed to have been used in the shooting. During cross-examination, trial counsel asked Sanchez if she knew Zamora to be a violent person. On re-direct examination, the State asked Sanchez whether she was aware that Zamora had been convicted of attempted murder. Trial counsel immediately objected, and the State responded that trial counsel had "opened the door" to this line of questioning. The trial court discussed the objection with counsel outside the jury's presence, and, at the State's request, the trial court agreed

10

to withdraw the question, strike it from the record, and instruct the jury to disregard it. Trial counsel responded that an instruction to disregard would not remedy the problem and requested a mistrial. Trial counsel's request was denied.[2] The trial court then instructed the jury:

> Ladies and gentlemen of the jury, we took a break. There was an issue that already—that was for me to determine, and basically, what I'm going to tell you right now is the questions are not evidence. I don't know if I mentioned that to you before. Questions can never be evidence, okay?

> Last question was [sic] asked is not evidence. You cannot—I'm going to instruct you you cannot infer anything about it. You cannot speculate or guess anything about it. Okay. So get that question out of your mind. There was no answer anyway.

### 2.    Analysis

Zamora contends that "opening the door" does not constitute reasonable trial strategy, and that trial counsel was ineffective for failing to "demand a sufficient limiting instruction." The State agrees that trial counsel opened the door to the admission of evidence of Zamora's prior conviction by asking Sanchez if she had ever known Zamora to be violent. However, the State argues that the trial court's instruction to disregard cured any error made by trial counsel.

Zamora did not file a post-judgment motion for new trial; therefore, the record is silent on trial counsel's reasons for asking Sanchez whether she was aware of Zamora's criminal history. Assuming, without deciding, that trial counsel opened the door to the State's questioning of Sanchez and that trial counsel's action constituted deficient performance, Zamora has not shown by a preponderance of the evidence that there is a reasonable probability that, but for counsel's deficiency, the result of the proceeding would

---

[2] We note that although Zamora argues that trial counsel was ineffective for failing to request an adequate instruction, he does not contend that the trial court erred in refusing to grant a mistrial.

11

have been different.  *See Strickland*, 466 U.S. at 687.

The trial court instructed the jury to disregard the question after the State questioned Sanchez about her knowledge of Zamora's alleged prior conviction.  We generally presume that an instruction to disregard cures any harm flowing from the error.  *See Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005); *Martinez v. State*, 17 S.W.3d 677, 691 (Tex. Crim. App. 2000).  To refute this presumption, the appellant must point to evidence in the record that demonstrates that the jury failed to follow the trial court's instructions.  *Thrift*, 176 S.W.3d at 224; *see Phillips v. State*, 130 S.W.3d 343, 356 (Tex. App.–Houston [14th Dist.] 2004, pet. ref'd) (holding that when the record shows no evidence to the contrary, an appellate court assumes the jury followed the trial court's instruction to disregard).  Zamora points us to nothing in the record to suggest that the jury was in any way persuaded or affected by the State's question.  Therefore, we see no evidence that but for trial counsel's opening the door to the State's question and alleged failure in requesting an "adequate" limiting instruction, the result of the proceeding would have been different.  *See Strickland*, 466 U.S. at 687.  Zamora's third and fourth issues are overruled.

### III. LESSER-INCLUDED OFFENSE

In his fifth issue, Zamora contends that the trial court erred in denying his request for a jury charge instruction on manslaughter as to the capital murder charge.

#### A. Standard of Review

We use a two-part test to determine whether a defendant is entitled to an instruction on a lesser-included offense.  "First, the lesser-included offense must be included within the proof necessary to establish the offense charged; second, there must be some evidence in the record that if the defendant is guilty, he is guilty only of the lesser-included

offense." *Young v. State*, 283 S.W.3d 854, 875 (Tex. Crim. App. 2009). If the elements of the lesser offense are "'established by proof of the same or less than all the facts required to establish the commission of the offense charged,'" the first prong of the test is satisfied. *Hall v. State*, 225 S.W.3d 524, 536 (Tex. Crim. App. 2007) (quoting TEX. CODE CRIM. PROC. ANN. art. 37.09(1) (Vernon 2006)).

The second prong asks whether there is evidence that supports giving the instruction to the jury; anything more than a scintilla of evidence may suffice to entitle the defendant to a charge on the lesser-included offense. *Id.* The evidence produced must establish the lesser-included offense as "a valid, rational alternative to the charged offense." *Id.* (quoting *Forest v. State*, 989 S.W.2d 365, 367 (Tex. Crim. App. 1999)).

**B. Analysis**

The indictment alleged that Zamora intentionally or knowingly caused the death of Yaritza, an individual younger than six years of age, by shooting her with a deadly weapon. A person commits manslaughter "if he recklessly causes the death of an individual." TEX. PENAL CODE ANN. § 19.04(a) (Vernon 2003). Here, when the elements of capital murder as alleged in the indictment are compared with the elements of manslaughter, it is evident that manslaughter is "established by proof of the same or less than all the facts required to establish the commission of the offense charged." *See Hall*, 225 S.W.3d at 536; *see also Cardenas v. State*, 30 S.W.3d 384, 392-93 (Tex. Crim. App. 2000) (recognizing that manslaughter is a lesser-included offense of capital murder). Therefore, we next consider whether there was evidence adduced at trial that supported giving the instruction to the jury. *See Hall*, 225 S.W.3d at 536.

13

In order to meet the second prong, there must be some evidence that would permit a rational jury to find that if Zamora is guilty, he is guilty only of manslaughter. *See* TEX. CODE CRIM. PROC. ANN. art. 37.09; *Hall*, 225 S.W.3d at 536. The distinguishing element between manslaughter and capital murder is the requisite mental state. *Ross v. State*, 861 S.W.2d 870, 875 (Tex. Crim. App. 1992) (en banc). Murder is statutorily defined as intentionally or knowingly causing the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1). "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a) (Vernon 2003). "A person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* § 6.03(b). Manslaughter is defined as recklessly causing the death of an individual. *Id.* § 19.04(a). A person acts recklessly "with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." *Id.* § 6.03(c).

Applying these definitions, the second prong of the test is satisfied if there is some evidence from which a rational jury could find that Zamora consciously disregarded the substantial and unjustifiable risk that his conduct would cause Yaritza's death, rather than finding that (1) it was Zamora's conscious objective or desire to cause Yaritza's death, or (2) Zamora was aware that his conduct was reasonably certain to cause Yaritza's death.[3]

---

[3] We note that the trial court instructed the jury on the law of parties. *See* TEX. PENAL CODE ANN. §§ 7.01(a), 7.02(a)(2) (Vernon 2003). Zamora did not challenge the instruction in the trial court or in this Court. Therefore, the jury could have found Zamora criminally responsible for Favio's actions. *See id.* § 7.02(a)(2) (providing that "[a] person is criminally responsible for the conduct of another if . . . acting with intent to

14

*See Young*, 283 S.W.3d at 875-76. On appeal, Zamora argues that there was no evidence that Zamora "specifically intended the death of Yaritza" and that Alcazar's testimony that Zamora was one of the gunmen that fired at Vargas's yellow Volkswagen supports a finding that Zamora "acted recklessly." We disagree.

Intent may be inferred from a defendant's actions, words, and conduct. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995). "Intent may also be ascertained or inferred from the means used and the wounds inflicted." *Yanez v. State*, 199 S.W.3d 293, 311 (Tex. App.–Corpus Christi 2006, pet. ref'd) (citing *Womble v. State*, 618 S.W.2d 59, 64 (Tex. Crim. App. 1981)). When a deadly weapon is used in a deadly manner, the inference is almost conclusive that the appellant intended to kill. *Godsey v. State*, 719 S.W.2d 578, 581 (Tex. Crim. App. 1986) (en banc); *Yanez*, 199 S.W.3d at 311 n.13. A firearm is a deadly weapon per se. *See* TEX. PENAL CODE ANN. § 1.07(a)(17)(A) (Vernon Supp. 2009); *Ex parte Huskins*, 176 S.W.3d 818, 820 (Tex. Crim. App. 2005).

The jury heard testimony that Vargas's friend, Silva shot at Mendoza, a relative of Zamora's brother-in-law, at a "cock fight." Vargas and Garibay bailed Silva out of jail and found him an attorney. Vargas testified that the Thursday before Yaritza was killed, Mendoza approached Vargas at the soccer field, asked her if she had a problem with him, and asked why Silva had shot at him. Upon leaving the soccer field, Vargas noticed a man, whom she later identified as Zamora, sitting alone in a truck in the parking lot "watching" her. The following Tuesday, Vargas noticed a white Taurus following her Volkswagen as she left the soccer field. Additional testimony revealed that the Taurus

---

promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. . .").

15

possibly belonged to Favio.

Vargas testified that the Taurus passed her soon after she turned onto Sugar Road. Vargas stated that the Taurus stopped in front of her Volkswagen and "two guys" exited the Taurus and opened fire on her vehicle. Vargas identified one of the gunmen as Favio, but was unable to identify the other gunman. Garibay and Meza were unable to identify either gunman, and Alcazar identified one of the gunmen as Zamora.[4] Vargas testified that after the shooting ceased, she saw the Taurus drive away and realized that Yaritza had been shot in the head. Eighteen bullet casings and one bullet were later found at the scene, and multiple bullet holes in the Volkswagen indicated that bullets had travelled through the front passenger side of the vehicle to the back driver's side.

In his statement, Zamora admits that on July 29, 2008, he drove Favio's white Taurus to the soccer field with Favio, Jorge, and Liz. Shortly after leaving the soccer field, Zamora followed Favio's instructions to "stop in front of the Volkswagen and block it." Zamora stated that after he stopped the Taurus, Favio and Liz "got out of the car and started to shoot at the Volkswagen." After the shooting, Zamora drove to a gas station and filled the Taurus with gasoline and then dropped it off in a Wal-Mart parking lot. According to Zamora's statement, he and Favio retrieved the Taurus on July 30, and, later that afternoon, Zamora took "two [.]38 Super pistols" and a shotgun to Gilberto Saenz's house so that Saenz could hide them. Zamora then stated that he drove Jorge and Liz to a bus station. On July 31, he left for Mexico with Favio.

Whether the jury believed that Zamora shot into the Volkswagen or that he drove

---

[4] However, cross-examination revealed that Alcazar never gave a statement to police identifying Zamora as a gunman.

the Taurus in a such a manner so as to assist or aid Favio in shooting at those inside the Volkswagen, a jury could reasonably infer an intent to kill.  *See Womble*, 618 S.W.2d at 64; *Yanez*, 199 S.W.3d at 311.  Moreover, there is no evidence that would permit a jury to find Zamora guilty only of manslaughter.  *See Yanez*, 199 S.W.3d at 311-12.   Based on the evidence contained in the record, the trial court did not err by refusing to charge the jury on the lesser-included offense of manslaughter.  *See Arnold v. State*, 234 S.W.3d 664, 672 (Tex. App.–Houston [14th Dist.] 2007, no pet.); *Yanez*, 199 S.W.3d at 311-12. Zamora's fifth issue is overruled.

## IV. LESS THAN UNANIMOUS VERDICT

In his sixth issue, Zamora contends that the trial court erred by failing to instruct the jury that its verdict must be unanimous regarding his guilt as a primary actor or party.

In count one, the jury charge provided that the jury could find Zamora guilty of attempted capital murder if either:  (1) Zamora, with the specific intent to commit capital murder, shot Meza and Yaritza and shot at or in the direction of Garibay and Vargas, which amounted to more than mere preparation that tended but failed to effect the commission of the offense intended; or (2) Favio, with the specific intent to commit capital murder, shot Meza and Yaritza and shot at or in the direction of Garibay and Vargas, which amounted to more than mere preparation that tended but failed to effect the commission of the offense intended, and Zamora, then and there knew of Favio's intent and acted with the intent to promote or assist the commission of the offense by Favio by encouraging, directing, aiding, or attempting to aid Favio to commit the offense.  In count two, the jury charge provided that the jury could find Zamora guilty of capital murder if either:  (1)

17

Zamora intentionally or knowingly caused the death of Yaritza by shooting her with a deadly weapon and Yaritza was younger than six years of age; or (2) Favio intentionally or knowingly caused the death of Yaritza by shooting her with a deadly weapon and Yaritza was younger than six years of age, and that Zamora knew of the intent of Favio to cause the death of Yaritza by shooting her with and deadly weapon, and Zamora acted with intent to promote or assist the offense by Favio by encouraging, directing, aiding, or attempting to aid Favio to commit the offense.

In reviewing a disjunctive jury charge, we first determine whether the application paragraphs contain different criminal acts or whether they merely instruct as to different means of committing a single offense. *Holford v. State*, 177 S.W.3d 454, 461 (Tex. App.–Houston [1st Dist.] 2005, pet. ref'd). Jury unanimity is not affected if the disjunctive charge merely addresses different means of committing a single offense. *See Jefferson v. State*, 189 S.W.3d 305, 312-13 (Tex. Crim. App. 2006). Both application paragraphs of count one pertain to the criminal act of attempted capital murder, and both application paragraphs of count two address the criminal act of capital murder. The trial court's instruction on party liability in count one provides an alternate method by which the jury could find that Zamora attempted to commit capital murder; it does not set forth a separate criminal act. *See Randall v. State*, 232 S.W.3d 285, 294 (Tex. App.–Beaumont 2007, pet. ref'd) (holding that the unanimity requirement was not violated where the jury was instructed that it could find the defendant guilty of capital murder as a principal or as a party); *see also Ramos v. State*, No.13-06-00646-CR, 2009 WL 3210924, at *10 (Tex. App.–Corpus Christi Oct. 8, 2009, no pet.) (mem. op., not designated for publication)

18

(concluding that the trial court's instruction on party liability provided an alternate method by which the jury could have found that appellant committed the offense of human trafficking and did not set forth a separate criminal act). Similarly, count two provides an alternate method by which the jury could find that Zamora committed capital murder and does not set forth a separate criminal act. *See Randall*, 232 S.W.3d at 294; *see also Ramos*, 2009 WL 3210924, at *10. Accordingly, the trial court did not err by failing to instruct the jury that it must unanimously determine whether Zamora was the primary actor or a party. Zamora's sixth issue is overruled.

## V. Conclusion

Having overruled all of Zamora's issues, we affirm the trial court's judgment.

_____
ROGELIO VALDEZ
Chief Justice

Do not publish.
Tex. R. App. P. 47.2(b)
Delivered and filed the
22nd day of April, 2010.

19